## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES *v.* BOARD OF EDUCATION OF THE TOWN OF CHESHIRE ET AL.
### (SC 17014)
### (SC 17015)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.[1]

---

[1] This case originally was argued before a panel of this court consisting of Chief Justice Sullivan and Justices Norcott, Katz, Palmer and Vertefeuille. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justices Borden and Zarella were added to the panel, and they have read the briefs, record and transcript of the oral argument.

*(Two justices dissenting in one opinion)*

Argued October 24, 2003—officially released August 31, 2004

*Charles Krich*, for the appellant-appellee (plaintiff).

*Stephen M. Sedor*, with whom, on the brief, was *Gary S. Starr*, for the appellees-appellants (named defendant et al.).

*Opinion*

BORDEN, J. The principal issue in these two appeals is whether the commission on human rights and opportunities has subject matter jurisdiction pursuant to General Statutes § 46a-58 (a),[2] to adjudicate a claim of racial discrimination brought by a student in a public school

[2] General Statutes § 46a-58 (a) provides: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, blindness or physical disability."

against the school principal and the local board of education on the basis of a discrete course of allegedly discriminatory conduct by the principal, or whether exclusive jurisdiction to adjudicate such a claim is vested in the state board of education pursuant to General Statutes §§ 10-4b[3] and

[3] General Statutes § 10-4b provides: "(a) Any resident of a local or regional school district, or parent or guardian of a student enrolled in the public schools of such school district who has been unable to resolve a complaint with the board of education of such local or regional school district may file with the State Board of Education a complaint in writing, or the state board may initiate a complaint, alleging the failure or inability of the board of education of such local or regional school district to implement the educational interests of the state in accordance with section 10-4a. If the state board, or its designee, finds such complaint to be substantial, it shall notify the local or regional board of such complaint and shall designate an agent who shall conduct a prompt investigation in accordance with procedures established by said state board and report the results of such investigation to the state board. The agent of the State Board of Education, in conducting an investigation, may summon by subpoena any records or documents related to the investigation. If the findings indicate that there is reasonable cause to believe that a local or regional board of education has failed or is unable to make reasonable provision to implement the educational interests of the state as defined in section 10-4a or that a local governmental body or its agent is responsible for such failure or inability, said state board shall conduct an inquiry. The State Board of Education shall give the board of education or a local governmental body or its agent involved the opportunity to be heard in accordance with the provisions of sections 4-176e to 4-184. Said state board may summon by subpoena any person whose testimony may be pertinent to the inquiry and any records or documents related to the provision of public education in the school district.

"(b) If, after conducting an inquiry in accordance with subsection (a) of this section, the state board finds that a local or regional board of education has failed or is unable to provide educational opportunities to meet the requirements of this section, sections 10-4a, 10-14q, 10-15c, 10-16, 10-16b and 10-42, subsection (a) of section 10-43, sections 10-47b, 10-53, 10-54, 10-66i, 10-71 and 10-76d, subsection (h) of section 10-76f and sections 10-76g, 10-76m, 10-76o, 10-97, 10-203, 10-220, 10-227, 10-261, 10-262j, 10-263, 10-266j, 10-266m, 10-273a, 10-277 and 10-280a, the state board shall (1) require the local or regional board of education to engage in a remedial process whereby such local or regional board of education shall develop and implement a plan of action through which compliance may be attained, or (2) order the local or regional board of education to take reasonable steps where such local or regional board has failed to comply with subdivision (3) of section 10-4a. Where a local or regional board of education is required to implement

10-15c.[4] We conclude that the commission has such jurisdiction.

The original complainant, Chillon Ballard, then a student at Cheshire High School, filed a complaint with the plaintiff, the commission on human rights and opportunities (commission), against the defendants, the board of education of the town of Cheshire (board) and

a remedial process pursuant to subdivision (1) of this subsection, upon request of such local or regional board, the state board shall make available to such local or regional board materials and advice to assist in such remedial process. If the state board finds that a local governmental body or its agent is responsible for such failure or inability, the state board may order such governmental body or agent to take reasonable steps to comply with the requirements of section 10-4a. The state board may not order an increase in the regular program expenditures, as defined in section 10-262f, of such local or regional board of education if such expenditures are in an amount at least equal to the minimum expenditure requirement in accordance with section 10-262j, provided that an increase in expenditures may be ordered in accordance with section 10-76d. If the state board finds that the state is responsible for such failure, the state board shall so notify the Governor and the General Assembly.

"(c) Upon the failure of a local or regional board of education to implement a remedial process, or upon the failure of a local or regional board of education or local governmental body or its agent to comply with an order of the state board in accordance with subsection (b) of this section, said state board may seek an order from the Superior Court to compel such board of education to implement a remedial process or to compel a local or regional board of education or local governmental body or its agent to carry out the order of the State Board of Education.

"(d) The state board shall pursuant to the provisions of chapter 54 adopt regulations concerning procedures for purposes of this section."

[4] General Statutes § 10-15c provides: "(a) The public schools shall be open to all children five years of age and over who reach age five on or before the first day of January of any school year, and each such child shall have, and shall be so advised by the appropriate school authorities, an equal opportunity to participate in the activities, programs and courses of study offered in such public schools, at such time as the child becomes eligible to participate in such activities, programs and courses of study, without discrimination on account of race, color, sex, religion, national origin or sexual orientation; provided boards of education may, by vote at a meeting duly called, admit to any school children under five years of age.

"(b) Nothing in subsection (a) of this section shall be deemed to amend other provisions of the general statutes with respect to curricula, facilities or extracurricular activities."

Thomas Neagle, the principal of Cheshire High School. Ballard alleged racial discrimination by the defendants. The defendants moved to dismiss the complaint. The commission, acting through a presiding human rights referee (referee), granted the motion to dismiss. The commission, acting through its office of commission counsel, appealed to the Superior Court pursuant to General Statutes §§ 4-183 (a)[5] and 46a-94a (a).[6] The court dismissed the appeal as to Ballard only, on the ground of mootness,[7] sustained the commission's appeal on the jurisdictional issue, and remanded the case to the commission for further proceedings. These appeals followed.

The defendants and the commission appealed separately from the judgment of the trial court to the Appellate Court, and we transferred the appeals to this court

[5] General Statutes § 4-183 (a) provides: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal."

[6] General Statutes § 46a-94a (a) provides: "The Commission on Human Rights and Opportunities, any respondent or any complainant aggrieved by a final order of a presiding officer or any complainant aggrieved by the dismissal of his complaint by the commission for failure to attend a mandatory mediation session as provided in subsection (c) of section 46a-83, a finding of no reasonable cause as provided in subsection (d) of said section 46a-83 or rejection of reconsideration of any dismissal as provided in subsection (e) of said section 46a-83, may appeal therefrom in accordance with section 4-183. The court on appeal shall also have jurisdiction to grant to the commission, respondent or complainant such temporary relief or restraining order as it deems just and suitable, and in like manner to make and enter a decree enforcing or modifying and enforcing as so modified or setting aside, in whole or in part, the order sought to be reviewed."

[7] The trial court held that the case was not moot as to the commission, however, on the grounds of: (1) its institutional interest in decisions affecting its decision-making ability; see *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 265, 777 A.2d 645 (2001); and (2) the possibility of statutory remedies against the board, such as ordering affirmative remedial conduct. Although no one has challenged that determination, because it is subject matter jurisdictional, we briefly note our agreement with it.

pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. The defendants' appeal challenges the trial court's determination that the commission has jurisdiction over the complaint before it. The commission's appeal challenges the trial court's determination that the appeal is moot as to Ballard. Although neither of these questions is free from difficulty, we conclude that: (1) the appeal is not moot as to Ballard; and (2) the commission has jurisdiction over Ballard's complaint.

For purposes of these appeals, the following facts and procedural history are undisputed. In December, 1997, Ballard, an African-American senior student at the high school, filed a sworn complaint with the commission alleging racial discrimination. Specifically, Ballard alleged that on October 9, 1997, he and a friend were called "nigger" by a white student, and a fight among the three students ensued. As a result of the altercation, Ballard and his friend were suspended from school for three days, but the white student was not suspended, in violation of the provision in the school handbook requiring the suspension of all students involved in fights. The complaint alleged further that, upon returning to school on October 16, 1997, the racial harassment against Ballard continued on a daily basis, with the white student calling Ballard names and threatening him, and that, when Ballard complained to Neagle, he told Ballard that he would document the information. According to the complaint, the harassment continued on a daily basis, and was reported to Neagle. On October 21, 1997, Ballard and his mother met with Neagle, who told them that it was one student's word against another's, and that nothing would be done about the harassment. At that point, Ballard "had to withdraw from" the high school. Ballard then withdrew from Cheshire High School, and later graduated from Hamden High School. In his complaint, Ballard also specifically requested that the commission "investigate

my complaint, secure for me my rights as guaranteed to me . . . and secure for me any remedy to which I may be entitled." In the prayer for relief portion of the complaint form, Ballard specifically requested "money damages."

The defendants moved to dismiss the complaint, and in May, 2000, the referee granted the motion, on the ground that exclusive jurisdiction over complaints based on racial discrimination in the public schools is vested in the state board of education (state board). The commission appealed from the dismissal to the trial court, but Ballard, who had been served as a party to the appeal, neither filed his own appeal nor joined the commission's appeal. The trial court concluded that: (1) the appeal was moot as to Ballard; and (2) contrary to the referee's conclusion, the commission has jurisdiction over the complaint. Accordingly, the court dismissed the appeal as to Ballard, sustained the commission's appeal, and remanded the case to the commission for further proceedings on the complaint.

I

Before reaching the substantive question of whether the commission has jurisdiction over the complaint in the present matter, we necessarily address two preliminary, subject matter jurisdictional questions, namely: (1) whether the trial court's remand to the commission was a final judgment for purposes of our appellate subject matter jurisdiction;[8] and (2) whether the appeal is moot as to Ballard. We conclude that: (1) the remand was a final judgment for purposes of appeal; and (2) the appeal is not moot as to Ballard.

---

[8] Upon noticing this subject matter jurisdictional issue, we requested the parties to brief it. All the parties contended that the trial court's remand was a final judgment under our existing jurisprudence and, if it were not, invited this court to reexamine that jurisprudence. As our ensuing discussion indicates, we have accepted that invitation.

## A

We first address the question of the finality of the trial court's remand. This question requires us to reexamine two of our recent cases, namely, *Lisee* v. *Commission on Human Rights & Opportunities*, 258 Conn. 529, 782 A.2d 670 (2001), and *Morel* v. *Commissioner of Public Health*, 262 Conn. 222, 811 A.2d 1256 (2002). Both cases involved remands by the trial court in administrative appeals pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq.

In *Lisee* v. *Commission on Human Rights & Opportunities*, supra, 258 Conn. 533, the trial court had issued a remand pursuant to § 4-183 (h).[9] We were called upon to determine the meaning of the final sentence of § 4-183 (j),[10] which provides: "For purposes of *this section*, a remand is a final judgment." (Emphasis added.) See

[9] General Statutes § 4-183 (h) provides: "If, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court."

[10] General Statutes § 4-183 (j) provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment."

*Lisee* v. *Commission on Human Rights & Opportunities,* supra, 534–35. That sentence had been added to the UAPA by virtue of No. 88-317, §§ 23 and 107, of the 1988 Public Acts. *Lisee* v. *Commission on Human Rights & Opportunities,* supra, 534–35. We held that, despite the use of the word "section," which would have rendered *all* remands pursuant to § 4-183 final judgments irrespective of the particular subsection of § 4-183 on which the trial court relied in issuing its remand order, the legislature intended that sentence to apply only to remands issued pursuant to *subsection* (j) of § 4-183. Id., 539.

We also stated in *Lisee,* in dictum, that, when the legislature inserted the last sentence in § 4-183 (j), it intended to codify our prior decision in *Schieffelin & Co.* v. *Dept. of Liquor Control,* 202 Conn. 405, 521 A.2d 566 (1987), "as it applies to remands after rulings on the merits of an administrative appeal." *Lisee* v. *Commission on Human Rights & Opportunities,* supra, 258 Conn. 541–42. In *Schieffelin & Co.,* we distinguished, for purposes of appellate finality, between two different types of such remands: (1) those in which the trial court had determined that the administrative ruling was in error and ordered further administrative proceedings on that very issue; and (2) those in which the trial court had concluded that the administrative ruling was in some way incomplete and therefore not ripe for final adjudication, for example, where the court required further administrative evidentiary findings "as a precondition to final judicial resolution of all the issues between the parties." *Schieffelin & Co.* v. *Dept. of Liquor Control,* supra, 410. In this regard, remands falling under the former category would constitute final judgments for purposes of appeal, but those falling under the latter category would not. Id. Thus, after *Lisee,* a trial court's remand, even if issued pursuant to subsection (j) of § 4-183; see footnote 10 of this

opinion; would constitute a final judgment for purposes of appeal only if it satisfied the test in *Schieffelin & Co.*

In *Morel* v. *Commissioner of Public Health*, supra, 262 Conn. 230–31, we reaffirmed this reading of *Lisee*, as requiring the application of the *Schieffelin & Co.* test to remands issued pursuant to § 4-183 (j). Furthermore, we expanded on that test by stating that it must be applied on a case-by-case basis, and that "an essential part of the test is the effect that the remand has on the rights of the party who seeks to appeal from it." Id., 232. Thus, under that test, in order to determine the finality of such a remand, a reviewing court would have to examine the nature of the remand, including the nature of the administrative proceedings, if any, that would be expected to follow it. Id., 232–33.

If we were to apply *Lisee* and *Morel* to the trial court's remand in the present case, it is doubtful that it would constitute a final judgment for purposes of appeal. We conclude, however, that, to the extent that *Lisee* and *Morel* rest on the notion that, by enacting the last sentence of § 4-183 (j), namely, "[f]or purposes of this section, a remand is a final judgment," the legislature intended to codify the *Schieffelin & Co.* test for finality, those cases were wrongly decided, and we now disavow the dictum to that effect in *Lisee*, and we overrule the holding to that effect in *Morel*.[11] Accordingly, we conclude that, where the court issues a remand pursuant to § 4-183 (j), the remand is a final judgment for purposes of appeal, irrespective of both the nature of the remand and the administrative proceedings that are expected to follow it. Thus, because the remand in the

[11] We emphasize, however, that we adhere to our reasoning in both *Lisee* and *Morel* that the reference in the last sentence of § 4-183 (j) to "this section" must be read as referring only to subsection (j) of § 4-183, and not to any other subsection thereof, and, therefore, *Morel* ultimately reached the correct result in applying § 4-183 (j) in determining that there was a final judgment for purposes of appeal in that case.

present case was issued pursuant to § 4-183 (j), it was a final judgment for purposes of appeal.

We recognize the power and importance of the doctrine of stare decisis, particularly when the precedent in question involved the interpretation of a statute. *Waterbury* v. *Washington*, 260 Conn. 506, 538, 800 A.2d 1102 (2002) ("[T]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . In assessing the force of stare decisis, our case law has emphasized that we should be especially cautious about overturning a case that concerns statutory construction." [Citation omitted; internal quotation marks omitted.]). Nonetheless, we conclude that, for the reasons that follow, this is one of those exceptional cases where, having become aware of the clear error of our ways, it is wiser to correct our errors now, rather than wait for the legislature to do so. See *Conway* v. *Wilton*, 238 Conn. 653, 662, 680 A.2d 242 (1996).

First, as we have indicated, our statement in *Lisee* v. *Commission on Human Rights & Opportunities*, supra, 258 Conn. 541–42, that, by adding the final sentence to § 4-183 (j), the legislature intended to codify our earlier decision in *Schieffelin & Co.*, was dictum. Having already concluded that the reference in that final sentence of § 4-183 (j) to "this section" really meant "this subsection (j)," it was not necessary for us to address whether the language at issue was intended to codify *Schieffelin & Co.* because the trial court's remand in *Lisee* had been issued pursuant to subsection (h) of § 4-183, and not pursuant to subsection (j) thereof. Indeed, both this court and the Appellate Court previously had stated that "the UAPA now provides that *any* remand to the administrative [agency] is a final judgment for purposes of an appeal. General Statutes § 4-183 (j); see *Connecticut Resources Recovery* v. *Commissioner of Environmental Protection*, 233

Conn. 486, 496, 659 A.2d 714 (1995)." (Emphasis added.) *Jones* v. *Crystal*, 242 Conn. 599, 602 n.4, 699 A.2d 961 (1997); see also *Johnston* v. *Salinas*, 56 Conn. App. 772, 774 n.4, 746 A.2d 202 (2000); *Dacey* v. *Commissioner on Human Rights & Opportunities*, 41 Conn. App. 1, 5, 673 A.2d 1177 (1996).

Second, there was simply no basis, in either the language of § 4-183 (j) or its legislative history, for our statement that the legislature intended to codify our decision in *Schieffelin & Co.* Indeed, in neither *Lisee* nor *Morel* did we cite to any such language or history. To the contrary, we are now persuaded, on the basis of both that language and its legislative history, that the legislature intended to eliminate the kind of case-by-case determination that had been required under the *Schieffelin & Co.* rubric.

The language of the last sentence of § 4-183 (j) is inconsistent with an intention to codify *Schieffelin & Co.* Section 4-183 (j) provides in relevant part: "For purposes of this section, a remand is a final judgment." This is inclusive and categorical language. Under *Schieffelin & Co.*, however, some remands are final judgments and others are not, depending on their nature and the scope of the ensuing administrative proceedings that they contemplate. The inclusive and categorical nature of the legislative language is not suggestive of the kind of fact-specific inquiry that would be required by an application of the *Schieffelin & Co.* test. Put another way, if the legislature had intended to codify that test, we would expect to see a legislative formulation cast in terms similar to those used in its judicial formulation. What we see, however, is quite different— a categorical statement that "a remand is a final judgment," suggesting instead an intention to depart from the prior case-by-case, fact-specific jurisprudence represented by *Schieffelin & Co.*

This conclusion is supported by the legislative history of § 4-183 (j), which we did not address in either *Lisee* or *Morel*.[12] Section 4-183 (j) was enacted as part of Public Act 88-317. Thus, it was part of the legislative "comprehensive revision of the UAPA, based upon recommendations made after nearly three years of study and review by the Connecticut law revision commission. See 31 H.R. Proc., Pt. 21, 1988 Sess., p. 7320, remarks of Representative Martin Looney; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1988 Sess., p. 185, remarks of David Biklen, executive director of the Connecticut law revision commission; 1987 Thirteenth Annual Report of the Connecticut Law Revision Commission to the General Assembly, March, 1988, p. 31 (Law Revision Commission Report)." *Tolly* v. *Dept. of Human Resources*, 225 Conn. 13, 26, 621 A.2d 719 (1993). The general purpose of that comprehensive revision was "to modify the prior law so as to simplify and make more fair the process of appealing an agency

---

[12] The dissent objects to our consultation of the legislative history of § 4-183 (j) on the ground that the last sentence of § 4-183 (j) "unambiguously provides that all remands arising under § 4-183 (j) are final judgments." This statement by the dissent is plainly wrong. The last sentence of § 4-183 (j) provides no such thing; instead, it provides: "For purposes *of this section*, a remand is a final judgment." (Emphasis added.) As we indicated in both *Lisee* and *Morel*, the reference to "this section" would, if read literally, apply to all remands under *§* 4-183, not just to remands under *subsection* (j) of § 4-183. See *Lisee* v. *Commission on Human Rights & Opportunities*, supra, 258 Conn. 539; *Morel* v. *Commissioner of Public Health*, supra, 262 Conn. 230. Thus, if anything, under the dissent's view that the last sentence of § 4-183 (j) is plain and unambiguous, the dissent would be required to disagree with: (1) both *Lisee* and *Morel*; and (2) our conclusion that only remands under § 4-183 (j) are final judgments. The dissent, however, inexplicably *agrees* that the last sentence of § 4-183 (j) refers to only remands under *subsection* (j) of § 4-183, and not to all remands under § 4-183. That conclusion is *not* compelled by the plain language of the statute, and, therefore, the dissent's objection to our consultation of the legislative history of § 4-183 (j) is baseless. Thus, considering that the dissent agrees that the language "this section" as used in subsection (j) of § 4-183 refers only to *subsection* (j), it is difficult to conclude that the statutory text at issue is plain and unambiguous.

decision under the UAPA." Id., 29–30; see *Glastonbury Volunteer Ambulance Assn., Inc.* v. *Freedom of Information Commission*, 227 Conn. 848, 853, 633 A.2d 305 (1993). In enacting this revision, the legislature was "heed[ing] . . . pleas for greater simplicity and fairness in the administrative appeal process." *Tolly* v. *Dept. of Human Resources*, supra, 30–31 n.10. It is consistent with that general purpose of simplification to interpret the language of § 4-183 (j) to mean what it categorically says, namely, that a remand under that section is a final judgment, without resort to the complexities of the *Schieffelin & Co.* test; and it would be inconsistent with that purpose to interpret it as codifying those complexities.

Furthermore, the Law Revision Commission Report explaining the 1988 revisions addressed this very question in a way that suggests that our dictum in *Lisee* was incorrect. In discussing the scope of judicial review under the revised subsection (j) of § 4-183 where an agency action is required by law, the law revision commission stated: "Subsections (j) and (k) rewrite former subsection (g) for clarity, but the standards for sustaining an appeal—formerly in subsection (g)—are not changed. A court must affirm the agency's decision unless substantial rights of the person appealing have been prejudiced in one of six circumstances. If the court finds such prejudice, it must sustain the appeal. Ordinarily, the court would take no other action. *The court may, however, remand the case to the agency for further proceedings (such a remand is a final judgment), or, if a particular action is required by law, modify the agency decision or order a particular agency action.* (See *Watson* v. *Howard*, 138 Conn. 464 [86 A.2d 67 (1952)].)" (Emphasis added.) Law Revision Commission Report, supra, p. 40; see Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1988 Sess., p. 386. Two aspects of this statement of the law revision

commission are significant. First, the law revision commission itself used the categorical language that "a remand is a final judgment," without reference to the noncategorical *Schieffelin & Co.* test. Law Revision Commission Report, supra, p. 40. "Given the makeup of the advisory drafting committee of the commission, we must presume that, when the commission reported to the legislature that [a remand is a final judgment] . . . the commission was aware of the jurisdictional implications of that" statement. (Citation omitted; internal quotation marks omitted.) *Glastonbury Volunteer Ambulance Assn., Inc.* v. *Freedom of Information Commission*, supra, 227 Conn. 856–57. Second, the citation to *Watson* v. *Howard*, supra, 464, as an example of a remand being a final judgment, belies any intention to codify the *Schieffelin & Co.* test, because *Watson* was a case in which the trial court's remand was held to be a final judgment, despite the fact that it most likely would not have satisfied the *Schieffelin & Co.* test.[13]

In addition, policy considerations counsel that, having come to the conclusion that the last sentence of § 4-183 (j) does not codify *Schieffelin & Co.*, we should correct the error now. If we were to adhere to stare decisis and continue to follow *Lisee* and *Morel*, it would mean that many remands issued by the trial court would not be final judgments for purposes of appeal. That would mean, in turn, that, in any case in which the trial court improperly remanded the case for further administrative proceedings, but under circumstances that did not meet the *Schieffelin & Co.* criteria for finality, the administrative agency would be required to undergo further proceedings that it would not otherwise have had to conduct. Such unnecessary proceedings would be a waste of administrative resources.

---

[13] In *Watson* v. *Howard*, supra, 138 Conn. 467, the remand by the trial court was for a new evidentiary hearing. Such a remand likely would not have satisfied the *Schieffelin & Co.* finality test.

Finally, "[t]he arguments for adherence to precedent are least compelling . . . when the rule to be discarded may not be reasonably supposed to have determined the conduct of litigants . . . ." (Internal quotation marks omitted.) *Conway* v. *Wilton*, supra, 238 Conn. 661. Our prior decisions in *Lisee* and *Morel*, regarding the application of the *Schieffelin & Co.* test, are not the type of decision that generates a significant reliance interest. It cannot be reasonably maintained that litigants have formed their conduct on the basis of whether a judicial remand constituted a final judgment for purposes of appeal.

B

We next consider the question of mootness with respect to Ballard's appeal. The commission, in its appeal, claims that the trial court improperly dismissed the appeal as to Ballard individually on the ground of mootness. We agree.

Before addressing the mootness issue, however, we consider, and ultimately reject, the defendants' preliminary claim that Ballard has waived any right that he may have had to obtain relief from the board. This claim is based on the fact that Ballard: (1) failed to file his own appeal from the decision of the commission; and (2) failed to participate in the commission's appeal.[14] Therefore, the defendants argue, Ballard "ignored his responsibility to protect his own rights and appeal the [presiding human rights] [r]eferee's decision . . . [and] he has waived his right to independently pursue any relief against the [defendants]."

---

[14] The defendants also rely on the fact that, prior to the commission's dismissal of his complaint, Ballard failed to appear at a prehearing conference scheduled by a hearing officer. We fail to see how such an innocuous and isolated failure by a complainant, particularly one unrepresented by counsel, could amount to a waiver of his right to obtain a remedy for past racial discrimination.

There is no question that pursuant to § 46a-94a (a),[15] Ballard, as the original complainant, could have filed his own separate appeal from the commission's dismissal of his complaint. There is also no question that, having been served as a party to the commission's appeal, Ballard could have either filed his own appearance therein, or formally moved to be made a party thereto. These facts do not mean, however, as the defendants' argument suggests, that Ballard's failure to do so amounted to a waiver of any right to benefit personally from any relief that the commission may ultimately secure on his behalf.

As the commission points out, under its statutory regime, the commission, and not the original complainant, carries the laboring oar in investigating, attempting to mediate, presenting, and ultimately administratively adjudicating, a claim of discrimination filed by an individual complainant. See, e.g., General Statutes §§ 46a-82, 46a-83, 46a-83b, 46a-84, 46a-86, 46a-89 and 46a-90. Indeed, it was not until 1989 that General Statutes § 46a-84 (d) authorized a complainant to "be represented by an attorney of his own choice"; see Public Acts 1989, No. 89-332; and even in that event, the complainant's attorney may only present the case to the extent that "the Attorney General or the commission counsel, as the case may be, determines that the interests of the state will not be adversely affected . . . ." General Statutes § 46a-84 (d).

Our cases have recognized the primary role of the commission in enforcing our laws barring discrimination. For example, we have recognized the commission's institutional interest in the "integrity of [its] decision-making process and its ability to carry out its responsibilities . . . [which include] protecting the public interest as well as individual complainants

[15] See footnote 6 of this opinion for the text of § 46a-94a (a).

. . . ." *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 265–66, 777 A.2d 645 (2001). Thus, we recognize that, in enforcing the laws against discrimination, the commission acts in a dual role: it protects both the public interest and the private complainant. Id., 266; see *Groton* v. *Commission on Human Rights & Opportunities*, 169 Conn. 89, 100, 362 A.2d 1359 (1975) ("commission clearly is empowered by statute to prosecute complaints on issues of public interest"); see also General Statutes § 46a-103 (commission may intervene as matter of right in private action brought by previously released complainant). We have also specifically acknowledged that not all of the "victims of various forms of discrimination" are represented by counsel. *Williams* v. *Commission on Human Rights & Opportunities*, supra, 283. Indeed, in the present case, there is no indication that Ballard was ever represented by counsel. Finally, we have referred to the commission's "first-order administrative oversight and enforcement [of claims of discrimination, and its] . . . initial responsibility for the investigation and adjudication" of such claims. *Sullivan* v. *Board of Police Commissioners*, 196 Conn. 208, 216, 491 A.2d 1096 (1985). The complaint form that Ballard filed with the commission further acknowledged this primary role. On that form, he requested that *the commission* investigate his complaint, and that *the commission* secure for him any rights or remedies to which he may have been entitled, including damages.

On the basis of these considerations, we are not persuaded that, when the enforcement of our laws against discrimination shifts from the administrative level to the judicial level, by way of an appeal from a commission decision, the complainant forfeits his rights to future benefits from the commission's ultimate decision by not formally participating in the appeal, either by filing his own appeal or formally intervening, or by filing

his own appearance therein. To hold otherwise would mean, in practical terms, that a complainant who was not represented by counsel before the commission and thereby relied on the commission's primary role to protect his rights at the administrative level, must engage counsel in order to maintain that protection, at both the judicial level and, if the case were to return to the commission, at the ensuing administrative level. It would also mean that the failure of the individual complainant formally to participate in an appeal would strip the commission of that part of its mission dedicated to vindicating individual rights against discrimination. There is nothing in either the statutory scheme or in sound policy to justify such a conclusion. Put another way, the commission's role of protecting both the public interest and the interest of the complainant does not change simply because its decision has been appealed to the courts, irrespective of whether the complainant formally participates in the appeal.

We turn, therefore, to the question of whether, under the circumstances of this case, the appeal is nonetheless moot as to Ballard. This question turns on whether the commission, assuming that it has jurisdiction to adjudicate Ballard's complaint, can afford him some practical remedy or form of relief, because the absence of such a remedy or relief would, nonetheless, render the case moot as to him. It is axiomatic that, when events have occurred that preclude a court from granting practical relief to a party through a disposition on the merits, the case is moot. *Blesso Fire Systems, Inc.* v. *Eastern Connecticut State University*, 245 Conn. 252, 256, 713 A.2d 1283 (1998). The same is ordinarily true of an administrative agency.

The commission claims that the present case is not moot as to Ballard because, if it finds that the defendants engaged in a discriminatory practice, it could award compensatory damages to him pursuant to Gen-

eral Statutes § 46a-86 (c).[16] Specifically, the commission contends that, because it has jurisdiction to adjudicate Ballard's complaint pursuant to § 46a-58 (a);[17] see footnote 2 of this opinion; it may award compensatory damages, such as damages for emotional distress or loss of dignity, pursuant to § 46a-86 (c).[18] The defendants

[16] General Statutes § 46a-86 provides in relevant part: "(a) If, upon all the evidence presented at the hearing conducted pursuant to section 46a-84, the presiding officer finds that a respondent has engaged in any discriminatory practice, the presiding officer shall state his findings of fact and shall issue and file with the commission and cause to be served on the respondent an order requiring the respondent to cease and desist from the discriminatory practice and further requiring the respondent to take such affirmative action as in the judgment of the presiding officer will effectuate the purpose of this chapter.

"(b) In addition to any other action taken hereunder, upon a finding of a discriminatory employment practice, the presiding officer may order the hiring or reinstatement of employees, with or without back pay, or restoration to membership in any respondent labor organization, provided, liability for back pay shall not accrue from a date more than two years prior to the filing or issuance of the complaint and, provided further, interim earnings, including unemployment compensation and welfare assistance or amounts which could have been earned with reasonable diligence on the part of the person to whom back pay is awarded shall be deducted from the amount of back pay to which such person is otherwise entitled. The amount of any such deduction for interim unemployment compensation or welfare assistance shall be paid by the respondent to the commission which shall transfer such amount to the appropriate state or local agency.

"(c) In addition to any other action taken hereunder, upon a finding of a discriminatory practice prohibited by section 46a-58, 46a-59, 46a-64, 46a-64c, 46a-81b, 46a-81d or 46a-81e, the presiding officer shall determine the damage suffered by the complainant, which damage shall include, but not be limited to, the expense incurred by the complainant for obtaining alternate housing or space, storage of goods and effects, moving costs and other costs actually incurred by him as a result of such discriminatory practice and shall allow reasonable attorney's fees and costs. . . ."

[17] Of course, if the defendants are correct in their claim that the commission has no such jurisdiction, then we would not need to reach the question of whether, as a general matter, the commission may award compensatory damages pursuant to § 46a-86 (c). We conclude, however, in part II of this opinion, that the commission has jurisdiction over Ballard's complaint pursuant to § 46a-58 (a).

[18] It is true, as the record indicates, that quite some time has passed since the dates of the alleged discriminatory conduct by the defendants, and that Ballard may no longer be interested in the commission pursuing any personal

argue, to the contrary, that the commission does not have the authority under § 46a-86 (c) to award Ballard personal compensatory damages of the sort claimed by the commission; rather, the defendants assert, that statute expressly limits the relief to monetary costs that are actually incurred by the complainant. Thus, the defendants contend, § 46a-86 does not authorize the award of any damages that would be applicable to Ballard's case. Although we need not specify the precise type of compensatory damages the commission may award to Ballard, we agree with the commission that § 46a-86 (c) authorizes it to award some appropriate form of compensatory damages to him upon a finding that the defendants engaged in a discriminatory practice pursuant to § 46a-58 (a).[19]

This presents a question of statutory interpretation, over which our scope of review is plenary. *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, 266 Conn. 706, 714–15, 835 A.2d 33 (2003). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute[s] [themselves], to the legislative history and circumstances surrounding [their] enactment, to the legislative policy [they were] designed to implement, and to [their] relationship to existing legislation and common law principles governing the same general subject matter. . . . *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003)."[20]

---

vindication on his behalf. That issue remains to be seen, however, following the ensuing remand to the commission.

[19] Because Ballard has not as yet employed an attorney, the commission does not claim that it could award him attorney's fees.

[20] "In *State* v. *Courchesne,* supra, 262 Conn. 567–78, this court explained that, as part of the judicial task of statutory interpretation, we would not follow the so-called 'plain meaning rule,' which operates to preclude the

(Internal quotation marks omitted.) *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, supra, 715–16.[21]

We first note that the specific statutory section upon which the commission's authority to adjudicate Bal-

court, in certain cases, from considering sources in addition to the statutory text in order to determine its meaning. We are cognizant that, subsequent to our decision in *Courchesne*, No. 03-154, § 1, of the 2003 Public Acts (P.A. 03-154), has legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of sources of the meaning of legislative language in addition to its text. *State* v. *Courchesne*, supra, 577. Public Act 03-154 provides: 'The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.' " *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, supra, 266 Conn. 716 n.10. The present case does not present an appropriate occasion to consider P.A. 03-154 because this is not a case in which the applicable statutory text is plain and unambiguous.

[21] The dissent accuses the majority of: "legislating, not interpreting legislation"; engaging in a "question begging technique" that it finds "familiar"; and addressing arguments to the contrary as "afterthought[s]." As the ensuing analysis demonstrates, however, we have consistently and carefully examined all of the appropriate sources of the meaning of the statutory text at issue, namely, its language, legislative history, purposes, and relationship to other related legislation and common-law principles, and we have, with equal conscientiousness and care, explained our reasons for reaching the conclusion that we reach.

Furthermore, in an effort to bolster its "afterthought[s]" assertion, the dissent observes that "the majority considers the defendants' arguments based on the plain and ordinary meaning of the language of § 46a-86 (c) only *after* reaching its conclusion as to the meaning of the statute on the basis of the language of § 46a-58 and the legislative history and genealogy of § 46a-86 (c)." (Emphasis in original.) It is common practice in this court, however, for purely organizational purposes, to address the arguments with which we disagree *after* we state and give our reasons for our ultimate conclusion. Merely because we *discuss* the defendants' argument *after* we explain our conclusion does not mean that we considered the defendants' arguments as "afterthought[s]."

As we acknowledged at the outset of this opinion, none of the questions before this court is free from difficulty. We respect the right of the dissent to disagree with our conclusions. We emphatically reject its gratuitous and unjustified assertions, however, that we have reached those conclusions by "legislating," by "begging" the difficult questions before us, by treating any

lard's claim of racial discrimination rests is § 46a-58 (a). Section 46a-58 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of . . . race . . . ." This is broad and inclusive language, and strongly suggests a reference to the broad and inclusive panoply of rights, privileges and immunities, derived from a broad and inclusive set of sources, namely, any federal or state laws, or either or both constitutions.

With that backdrop in mind, we turn to the language of § 46a-86 (c), which relates to the damages that a complainant may suffer. We conclude that the language of that statute strongly suggests that compensatory personal damages may be awarded upon a finding of a discriminatory practice in violation of § 46a-58 (a). The pertinent language of § 46a-86 (c) provides: "In addition to any other action taken hereunder, upon a finding of a discriminatory practice prohibited by section 46a-58 . . . the presiding officer [of the commission] shall determine *the damage suffered by the complainant* . . . ." (Emphasis added.) Thus, the language of § 46a-86 (c) specifically refers back to § 46a-58 as one of the statutory bases for an award of "damage suffered by the complainant";[22] and the broad and inclusive language of

arguments as "afterthought[s]," or by engaging in any other judicially illegitimate technique, "familiar" or otherwise.

[22] The dissent concludes that, because §§ 46a-86 (c) and 46a-58 were enacted at different times, "the language of § 46a-58 sheds [no] light on the scope of the remedy provided by § 46a-86 (c)." It is difficult to understand why, however, given that § 46a-86 (c) specifically refers back to § 46a-58 as one of its bases for an award of damages, the two statutes should *not* be read together. Indeed, the dissent's conclusion runs counter to the well established notion that the meaning of the statutory language is to be determined, in part, by its relationship to other statutes involving the same subject matter. *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, supra, 266 Conn. 715; Public Acts 2003, No. 03-154, § 1 ("[t]he meaning of a statute

§ 46a-58 (a), with its references to such a broad range of constitutional rights, suggests that an award of compensatory damages for a violation thereof need not necessarily be confined to easily quantifiable monetary losses.[23]

Furthermore, following the reference to § 46a-58 in § 46a-86 (c) are specific references to General Statutes §§ 46a-59, 46a-64, 46a-64c, 46a-81b, 46a-81d and 46a-

shall, in the first instance, be ascertained from the text of the statute itself *and its relationship to other statutes*" [emphasis added]). Moreover, this conclusion of the dissent is curious, given its statement; see footnote 11 of the dissenting opinion; that "§ 46a-58 must be read in conjunction with § 46a-86 (c) to determine the scope of damages."

In this regard, the dissent asserts; see footnote 11 of the dissenting opinion; that "the majority presumably would *assume* . . . that . . . § 46a-58 . . . gives rise to an unconditional private right of action." (Emphasis in original.) We neither assume nor imply any such thing. We deal in the present case only with the scope of the statutory powers and authority of the commission as an administrative agency. Nothing in this opinion is intended to indicate— or reasonably could be read as indicating—any view regarding private rights of action, unconditional or otherwise.

[23] The dissent states that, assuming that "§ 46a-86 (c) created a broad right" it is "at least plausible, as a general matter, that the legislature might seek to balance the creation of a broad right by providing only a limited range of damages," support for which it cites, by analogy, to our workers' compensation statutes. Although what the legislature "*might* seek to" do could always be "plausible"; (emphasis added); the dissent presents no persuasive reason, rooted in either the language, legislative history or purposes of our civil rights statutory scheme—as opposed to our workers' compensation statutory scheme—to indicate that the legislature, in the context of civil rights legislation, *did* seek to "balance" the recognition of broad civil rights with "limited" damages. Indeed, we do not ordinarily read remedial legislation in this limited fashion, in the absence of some clear indication of legislative intent that a broadly stated substantive remedial right is intended to have only limited remedial consequences.

We do not suggest by this response to the dissent, however, that every asserted violation of every civil right considered by the commission will always yield a broad range of damages. We have held that not to be the case. See, e.g., *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 110, 653 A.2d 782 (1995). Each case must be evaluated on its statutory merits. We simply conclude that the violation claimed in the present case permits the commission to award some form of compensatory damages.

81e. See footnote 16 of this opinion. Those sections deal generally with discrimination in certain professional or occupational organizations; General Statutes § 46a-59; in certain places of public accommodation; General Statutes § 46a-64; in housing; General Statutes § 46a-64c; in certain professional or occupational organizations on the basis of sexual orientation; General Statutes § 46a-81b; in certain places of public accommodation on the basis of sexual orientation; General Statutes § 46a-81d; and in housing on the basis of sexual orientation. General Statutes § 46a-81e. Many of these latter statutory references invoke types and loci of discrimination that might lend themselves, more readily than the general discrimination prohibited by § 46a-58 (a), to assessment of damages that would be calculable in terms of monetary loss. This combination of statutory cross-references helps to explain the language of § 46a-86 (c) that the "damage suffered by the complainant . . . shall *include, but not be limited to*, the expense suffered by the complainant for obtaining alternate housing or space, storage of goods and effects, moving costs and other costs actually incurred by him as a result of such discriminatory practice and shall allow reasonable attorney's fees and costs." (Emphasis added.)

The legislative genealogy and history of § 46a-86 (c) further support the conclusion that it authorizes the commission to award compensatory damages upon a finding of a violation of § 46a-58 (a). The pertinent language at issue in § 46a-86 (c) derives originally from No. 756, § 1, of the 1967 Public Acts (P.A. 756),[24] which

---

[24] Public Acts 1967, No. 756, § 1, provided: "In addition to the penalties provided for violation of sections 53-34 [now § 46a-58] and 53-35 [now § 46a-64] and section 53-35a [now § 46a-59], any person claiming to be aggrieved by a violation of any such section may, by himself or his attorney, make, sign and file with the civil rights commission a complaint in writing under oath which shall state the circumstances of such violation and the particulars thereof and shall contain such other information as may be required by the commission. In addition, the commission, whenever it has reason to believe

amended General Statutes (Rev. to 1967) § 53-36. Public Act 756 expanded the authority of the commission, in cases in which it has found discrimination in public accommodations and housing practices; General Statutes (Rev. to 1967) § 53-35, now § 46a-64; and professional licensing; General Statutes (Rev. to 1967) § 53-35a, now § 46a-59; by giving the commission the specific authority, "in addition to any other action which it may take . . . [to] determine the damage suffered by the complainant, which damage shall include but not be limited to the expense incurred by the complainant for obtaining alternative housing or space, storage of goods and effects, moving costs, attorney's fees and any other costs actually incurred by him as a result of such unlawful practice." P.A. 756.

The legislative history of this 1967 legislation, although not determinative, is suggestive of a legislative intent that the commission's authority to determine the damages arising from the commissioner's finding of a discriminatory practice be broadly, rather than narrowly, construed. Representative William J. Lavery, in presenting the bill to the floor of the House of Representatives, stated: "To be brief . . . this bill would give to a person whose rights have been violated the right to

---

that section 53-35 or section 53-35a has been or is being violated, may issue a complaint. The commission may thereupon proceed upon such complaint in the same manner and with the same powers as provided in chapter 563 in the case of unfair employment practices, and the provisions of said chapter as to the powers, duties and rights of the commission, the complainant, the court, the attorney general and the respondent shall apply to any proceeding under the provisions of this section. *If upon all the evidence the hearing tribunal finds a respondent has engaged in an unlawful practice prohibited by sections 53-35 and 53-35a, it shall state its findings of fact and it shall, in addition to any other action which it may take hereunder, determine the damage suffered by the complainant, which damage shall include but not be limited to the expense incurred by the complainant for obtaining alternative housing or space, storage of goods and effects, moving costs, attorney's fees and any other costs actually incurred by him as a result of such unlawful practice.*" Language that was amended is indicated by italics.

ask civil damages in a court of equity, a Circuit Court. This will be brought after a hearing has been held by a hearing tribunal of the state civil rights commission and this civil rights commission will bring this action in the [C]ircuit [C]ourt representing the individual, this bill is a good bill and a bill that is protective of a human dignity and rights of every citizen of our state and I urge its adoption." 12 H.R. Proc., Pt. 11, 1967 Sess., p. 5366. The references to "the right to ask civil damages in a court of equity,"[25] and to the bill as "protective of [the] human dignity and rights of every citizen of our state"; id.; suggest this legislative intent.

Subsequently, in 1975, the legislature amended General Statutes (Rev. to 1975) § 53-36 by adding General Statutes § 53-34, which is the statutory antecedent to § 46-58 (a),[26] to the list of specific civil rights statutes for which the commission could award damages. See Public Acts 1975, No. 75-462.[27] Thus, as of 1975, the

[25] At that time, in 1967, the enforcement of the commission's determination of damages was by a petition brought by it in court. General Statutes (Rev. to 1967) § 31-128.

[26] In 1980, § 53-34 was transferred to § 46a-58 as part of No. 80-422, § 7, of the 1980 Public Acts.

[27] Public Acts 1975, No. 75-462 provided: "In addition to the penalties provided for violation of sections 53-34, 53-35 and 53-35a, any person claiming to be aggrieved by a violation of any such section may, by himself or his attorney, make, sign and file with the commission on human rights and opportunities a complaint in writing under oath which shall state the circumstances of such violation and the particulars thereof and shall contain such other information as may be required by the commission. In addition, the commission, whenever it has reason to believe that section *53-34*, 53-35 or section 53-35a has been or is being violated, may issue a complaint. The commission may thereupon proceed upon ANY such complaint PURSUANT TO SECTION *53-34*, *53-35* OR *53-35a* in the same manner and with the same powers as provided in chapter 563 in the case of unfair employment practices, and the provisions of said chapter as to the powers, duties and rights of the commission, THE TRIBUNAL, the complainant, the court, the attorney general, the counsel for the commission and the respondent shall apply to any proceeding under the provisions of this section. In the investigation of any complaint, filed pursuant to section 53-35 or section 53-35a, the commission may issue subpoenas requiring the production of records and other documents relating to the complaint under investigation. If upon all

commission had the authority to award damages in cases involving violations of what is now § 46a-58, namely, the broad and inclusive panoply of sources of civil rights enumerated therein; as well as for violations of persons' rights under the public accommodations and professional licensing statutes.

Thereafter, in 1980, the legislature enacted No. 80-422 of the 1980 Public Acts (P.A. 80-422), which was a general codification and technical revision of the statutes governing the commission.[28] This voluminous act contained fifty sections and consisted of twenty-five pages of codifications and revisions. Section 34 (c)[29] of P.A. 80-422 transformed what had been the last sentence of General Statutes (Rev. to 1979) § 53-36 into what is now § 46a-86 (c).[30]

---

the evidence the hearing tribunal finds a respondent has engaged in an unlawful practice prohibited by [sections] SECTION *53-34*, 53-35 [and] OR 53-35a, it shall state its findings of fact and shall, in addition to any other action which it may take hereunder, determine the damage suffered by the complainant, which damage shall include but not be limited to the expense incurred by the complainant for obtaining alternative housing or space, storage of goods and effects, moving costs, attorney's fees and any other costs *actually incurred by him as a result of such unlawful practice.*" Language that was amended is indicated by italics and capitalization.

[28] Public Act 80-422 was entitled, "An Act Concerning a Technical Revision of the Statutes Concerning Human Rights and Opportunities."

[29] Section 34 (c) of P.A. 80-422 provided: "In addition to any other action taken hereunder, upon a finding of a discriminatory practice prohibited by section 53-34 of the general statutes, as amended by section 7 of this act, section 53-35 of the general statutes, as amended by section 12 of this act, section 53-35a of the general statutes, as amended by section 8 of this act, or section 1 of substitute house bill 5319 of the current session, the hearing officer shall determine the damage suffered by the complainant, which damage shall include but not be limited to the expense incurred by the complainant for obtaining alternate housing or space, storage of goods and effects, moving costs, attorney's fees and any other costs actually incurred by him as a result of such discriminatory practice."

[30] Our examination of the legislative history of P.A. 80-422, fails to shed any light, however, on the meaning of § 46a-86 (c) because there was no meaningful discussion of it. See generally 23 H.R. Proc., Pt. 14, 1980 Sess., pp. 4237–46; 23 H.R. Proc., Pt. 24, 1980 Sess., pp. 7006–11; 23 S. Proc., Pt. 9, 1980 Sess., pp. 2981–82; 23 S. Proc., Pt. 10, 1980 Sess., pp. 3416–18, 3460–62; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1980 Sess., pp.

Thus, this legislative history and genealogy support our conclusion that § 46a-86 (c) authorizes an award of compensatory damages for a violation of § 46a-58. First, the legislative history embodied in Representative Lavery's comments indicate an intent to authorize a broad, rather than a limited, scope of damages, including damages protective of the "dignity" of an individual. 12 H.R. Proc., supra, p. 5366. Second, the genealogy suggests an ongoing legislative process of expanding the commission's authority to award damages.

The general remedial purpose of the antidiscrimination statutes as enforced by the commission supports this interpretation of § 46a-86 (c). That purpose is, in general, to construct a remedy for discrimination "that will, so far as possible, eliminate the discriminatory effects of the past as well as bar like discrimination in the future. . . . *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 478, 559 A.2d 1120 (1989); see *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, [232 Conn. 91, 111, 653 A.2d 782 (1995)]; *Civil Service Commission* v. *Commission on Human Rights & Opportunities*, 195 Conn. 226, 230–31, 487 A.2d 201 (1985)." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 350, 680 A.2d 1261 (1996). It would be consistent with that purpose to read the language of § 46a-86 (c) to mean that the commission has the authority to award personal compensatory damages. Indeed, the present case presents a powerful argument for reading that language in that fashion. According to his complaint,

---

1041–44, 1097, 1102–1105. Indeed, the legislative history indicates that P.A. 80-422 was precisely what its title stated it to be, namely, simply a technical revision of the statutes concerning human rights and opportunities; see footnote 28 of this opinion; with no intended substantive effect. See *Pollio* v. *Planning Commission*, 232 Conn. 44, 55, 652 A.2d 1026 (1995) ("[t]echnical amendments are not generally intended to effect substantive changes in the law").

Ballard was the victim of racial discrimination, as a result of which he was treated differently from the white students and was suspended for three days. If his complaint is proven, it would be difficult, if not impossible, to ascertain what precise monetary losses he incurred. Nonetheless, an award of money damages, where statutorily authorized, does more than remedy the past discrimination; it also serves as an important social deterrent to future discriminatory conduct. See *Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 418, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975) ("[w]here racial discrimination is concerned, the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future" [internal quotation marks omitted]). Thus, reading the language of the statute so as to afford the commission the authority to fashion some alternative personal award of damages for the alleged violation in the present case—i.e., something beyond monetary costs actually incurred by the complainant—would be consistent with the remedial purpose of remedying past discrimination, while also discouraging future discrimination.

Finally, although we have not specifically decided whether § 46a-86 (c) permits an award of personal compensatory damages; see *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, supra, 238 Conn. 348 n.15; we do not write on a completely blank slate. In *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 232 Conn. 92–93, we concluded that the commission did not have the authority to award damages for emotional distress and attorney's fees under § 46a-86 (a).[31] Our reasoning in that case is, nonetheless, highly instructive

---

[31] See footnote 16 of this opinion for the text of § 46a-86 (a).

on whether personal compensatory damages may be awarded under § 46a-86 (c).

In *Bridgeport Hospital*, the commission had ordered damages for emotional distress and attorney's fees upon a finding that the respondent hospital had engaged in discrimination prohibited by General Statutes § 46a-60 (a) (1),[32] which prohibits discrimination in employment.

---

[32] General Statutes § 46a-60 provides: "(a) It shall be a discriminatory practice in violation of this section:

"(1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness;

"(2) For any employment agency, except in the case of a bona fide occupational qualification or need, to fail or refuse to classify properly or refer for employment or otherwise to discriminate against any individual because of such individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness;

"(3) For a labor organization, because of the race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness of any individual to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer, unless such action is based on a bona fide occupational qualification;

"(4) For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84;

"(5) For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so;

"(6) For any person, employer, employment agency or labor organization, except in the case of a bona fide occupational qualification or need, to advertise employment opportunities in such a manner as to restrict such employment so as to discriminate against individuals because of their race,

Id., 96. The commission claimed that it could order such

color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness;

"(7) For an employer, by the employer or the employer's agent: (A) To terminate a woman's employment because of her pregnancy; (B) to refuse to grant to that employee a reasonable leave of absence for disability resulting from her pregnancy; (C) to deny to that employee, who is disabled as a result of pregnancy, any compensation to which she is entitled as a result of the accumulation of disability or leave benefits accrued pursuant to plans maintained by the employer; (D) to fail or refuse to reinstate the employee to her original job or to an equivalent position with equivalent pay and accumulated seniority, retirement, fringe benefits and other service credits upon her signifying her intent to return unless, in the case of a private employer, the employer's circumstances have so changed as to make it impossible or unreasonable to do so; (E) to fail or refuse to make a reasonable effort to transfer a pregnant employee to any suitable temporary position which may be available in any case in which an employee gives written notice of her pregnancy to her employer and the employer or pregnant employee reasonably believes that continued employment in the position held by the pregnant employee may cause injury to the employee or fetus; (F) to fail or refuse to inform the pregnant employee that a transfer pursuant to subparagraph (E) of this subdivision may be appealed under the provisions of this chapter; or (G) to fail or refuse to inform employees of the employer, by any reasonable means, that they must give written notice of their pregnancy in order to be eligible for transfer to a temporary position;

"(8) For an employer, by the employer or the employer's agent, for an employment agency, by itself or its agent, or for any labor organization, by itself or its agent, to harass any employee, person seeking employment or member on the basis of sex. 'Sexual harassment' shall, for the purposes of this section, be defined as any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (A) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (B) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (C) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment;

"(9) For an employer, by the employer or the employer's agent, for an employment agency, by itself or its agent, or for any labor organization, by itself or its agent, to request or require information from an employee, person seeking employment or member relating to the individual's childbearing age or plans, pregnancy, function of the individual's reproductive system, use of birth control methods, or the individual's familial responsibilities, unless such information is directly related to a bona fide occupational qualification or need, provided an employer, through a physician may request

awards because § 46a-86 (a) vested the commission

from an employee any such information which is directly related to workplace exposure to substances which may cause birth defects or constitute a hazard to an individual's reproductive system or to a fetus if the employer first informs the employee of the hazards involved in exposure to such substances;

"(10) For an employer, by the employer or the employer's agent, after informing an employee, pursuant to subdivision (9) of this subsection, of a workplace exposure to substances which may cause birth defects or constitute a hazard to an employee's reproductive system or to a fetus, to fail or refuse, upon the employee's request, to take reasonable measures to protect the employee from the exposure or hazard identified, or to fail or refuse to inform the employee that the measures taken may be the subject of a complaint filed under the provisions of this chapter. Nothing in this subdivision is intended to prohibit an employer from taking reasonable measures to protect an employee from exposure to such substances. For the purpose of this subdivision, 'reasonable measures' shall be those measures which are consistent with business necessity and are least disruptive of the terms and conditions of the employee's employment;

"(11) For an employer, by the employer or the employer's agent, for an employment agency, by itself or its agent, or for any labor organization, by itself or its agent: (A) To request or require genetic information from an employee, person seeking employment or member, or (B) to discharge, expel or otherwise discriminate against any person on the basis of genetic information. For the purpose of this subdivision, 'genetic information' means the information about genes, gene products or inherited characteristics that may derive from an individual or a family member.

"(b) (1) The provisions of this section concerning age shall not apply to: (A) The termination of employment of any person with a contract of unlimited tenure at an independent institution of higher education who is mandatorily retired, on or before July 1, 1993, after having attained the age of seventy; (B) the termination of employment of any person who has attained the age of sixty-five and who, for the two years immediately preceding such termination, is employed in a bona fide executive or a high policy-making position, if such person is entitled to an immediate nonforfeitable annual retirement benefit under a pension, profit-sharing, savings or deferred compensation plan, or any combination of such plans, from such person's employer, which equals, in aggregate, at least forty-four thousand dollars; (C) the termination of employment of persons in occupations, including police work and fire-fighting, in which age is a bona fide occupational qualification; (D) the operation of any bona fide apprenticeship system or plan; or (E) the observance of the terms of a bona fide seniority system or any bona fide employee benefit plan for retirement, pensions or insurance which is not adopted for the purpose of evading said provisions, except that no such plan may excuse the failure to hire any individual and no such system or plan may require or permit the termination of employment on

with authority "to issue an order requiring . . . the respondent to take such affirmative action as . . . will effectuate the purpose of . . . chapter [814c] . . . ." (Internal quotation marks omitted.) Id., 100. We rejected this claim, however, because we agreed with the respondent's argument that § 46a-86 (a) "cannot include *an authorization to award compensatory damages,* other than what is expressly authorized in subsection (b), or attorney's fees *because of the express restriction on the availability of such awards to cases brought under the specific statutes enumerated in subsections (c) and (d).*"[33] (Emphasis added.) Id. Throughout our opin-

the basis of age. No such plan which covers less than twenty employees may reduce the group hospital, surgical or medical insurance coverage provided under the plan to any employee who has reached the age of sixty-five and is eligible for Medicare benefits or any employee's spouse who has reached age sixty-five and is eligible for Medicare benefits except to the extent such coverage is provided by Medicare. The terms of any such plan which covers twenty or more employees shall entitle any employee who has attained the age of sixty-five and any employee's spouse who has attained the age of sixty-five to group hospital, surgical or medical insurance coverage under the same conditions as any covered employee or spouse who is under the age of sixty-five.

"(2) No employee retirement or pension plan may exclude any employee from membership in such plan or cease or reduce the employee's benefit accruals or allocations under such plan on the basis of age. The provisions of this subdivision shall be applicable to plan years beginning on or after January 1, 1988, except that for any collectively bargained plan this subdivision shall be applicable on the earlier of (A) January 1, 1990, or (B) the later of (i) the expiration date of the collective bargaining agreement, or (ii) January 1, 1988.

"(3) The provisions of this section concerning age shall not prohibit an employer from requiring medical examinations for employees for the purpose of determining such employees' physical qualification for continued employment.

"(4) Any employee who continues employment beyond the normal retirement age in the applicable retirement or pension plan shall give notice of intent to retire, in writing, to such employee's employer not less than thirty days prior to the date of such retirement."

[33] The dissent reads our decision in *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities,* supra, 232 Conn. 92–93, as holding "merely . . . that the term 'affirmative action' as used in § 46a-86 (a) was not intended to include the compensatory damages contemplated by § 46a-86 (c) and that damages for emotional distress, *if compensable at all,* would

ion, we emphasized the reasoning that compensatory damages *could* be sought for violations of the specific statutes listed in subsections (c) and (d) of § 46a-86. See, e.g., id., 103–104 (No. 91-58 of 1991 Public Acts amended § 46a-86 [c] to grant commission authority to award compensatory damages and attorney's fees for discrimination based on sexual orientation); id., 106 (compensatory damages and attorney's fees included within protective scope of § 46a-86 [c] and [d]); id., 113 (§ 46a-86 [c] and [d] provide for compensatory damages and attorney's fees for specific forms of discrimination). Our reasoning, therefore, was that it would be inappropriate to interpret the general language, "take such affirmative action," which is contained in § 46a-86 (a), so

---

be compensable in connection with the discriminatory conduct listed in [§ 46a-86 (c)]." (Emphasis in original.) This reading is untenable. As we already stated, it is the *reasoning* of *Bridgeport Hospital* that is instructive on the question of whether § 46a-86 (c) authorizes an award of personal compensatory damages. Despite the dissent's revisionist understanding of that reasoning, nowhere in that opinion did we say—or even intimate—that compensatory damages were awardable under § 46a-86 (c) only *"if compensable at all . . . ."* (Emphasis in original.) Instead, we stated repeatedly that compensatory damages and attorney's fees were precluded from § 46a-86 (a) "because of the express restriction on the availability of such awards to cases brought under the specific statutes enumerated in subsections (c) and (d)"; *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 100; and that in 1991 the legislature had amended § 46a-86 (c) "to grant [the commission] the authority to make awards of compensatory damages and attorney's fees to persons discriminated against based on sexual orientation in the areas of associations of licensed persons, public accommodations and housing. See General Statutes §§ 46a-81b, 46a-81d and 46a-81e." Id., 103. Needless to say, § 46a-58 is included in the statutory phrase at issue, as are the references to §§ 46a-81b, 46a-81d and 46a-81e. See footnote 16 of this opinion for the text of § 46a-86 (c); see also *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 113 ("in 1991 . . . § 46a-86 [c] and [d] were amended to provide for compensatory damages, and attorney's fees for certain specific forms of discrimination"). Thus, just as the legislature amended § 46a-86 (c) in 1991 to provide compensatory damages for "specific forms of discrimination"; *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 113; so too did the legislature in 1975, when it amended § 46a-86 (c) to include a specific reference to § 46a-58. See Public Act 75-462.

as to include the power to award compensatory damages and attorney's fees, precisely *because* compensatory damages and attorney's fees *were* awardable for the violations of those statutes listed under § 46a-86 (c) and (d). Thus, on the basis of our reasoning in *Bridgeport Hospital,* because § 46a-58 *is* specifically listed in § 46a-86 (c), upon a finding of a violation thereof by the commission in the present case, it is authorized to award compensatory damages to Ballard.

The defendants contend, to the contrary, that the commission is not authorized to award compensatory personal damages to Ballard pursuant to § 46a-86 (c). This contention has four bases, and we disagree with all of them.

The defendants first argue that the "damages that are specifically enumerated within . . . § 46a-86 (c) do not apply" to Ballard. Specifically, the defendants assert that: (1) subsection (c) of § 46a-86 explicitly authorizes damages for only "the expense incurred by the complainant for obtaining alternate housing or space, storage of goods and effects, moving costs and other costs actually incurred by him"; (2) these expenses are authorized for violating § 46a-59 (discrimination in professional license associations), § 46a-64 (discriminatory public accommodation practices prohibited), § 46a-64c (discriminatory housing practices prohibited), § 46a-81d (sexual orientation discrimination in public accommodations prohibited) and § 46a-81e (sexual orientation discrimination in housing prohibited); and (3) these specifically enumerated remedies are applicable only to these claims and not to "victims of discrimination in the public schools." There are several flaws in this analysis.

First, it ignores the specific reference in § 46a-86 (c) to a violation of § 46a-58. We fail to see how this is any less a specific reference than are the references to the

other statutes in the same sentence of § 46a-86 (c). Indeed, by its reference to "the Constitution or laws of this state or of the United States," § 46a-58 (a) necessarily encompasses other constitutional or statutory provisions, as the case may be, that may lend themselves more readily to damages *other than* expenses actually incurred by the complainant, such as moving expenses. Second, the defendants' assertion disregards the language of § 46a-86 (c) that describes the types of damages that may be recovered, namely, that "the presiding officer shall determine the damage suffered by the complainant, which damage shall include, *but not be limited to*" the enumerated expenses that follow. (Emphasis added.) See *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 309–10, 819 A.2d 260 (2003) ("[s]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" [internal quotation marks omitted]). The practical effect of the defendants' interpretation would be that the "damage suffered by the complainant" *would* be *limited to* those enumerated expenses, contrary to the express language of § 46a-86 (c). Third, as previously discussed, this contention of the defendants ignores our reasoning in *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 232 Conn. 98, that § 46a-86 (c) authorizes the award of personal compensatory damages.

The defendants next argue that, under the doctrine of ejusdem generis, the listing of the specific types of monetary losses in § 46a-86 (c) means that the legislature intended to limit the remedies under § 46a-86 (c) to out-of-pocket expenses, which do not include such personal compensatory damages as the commission seeks in the present case. Although in certain instances the doctrine of ejusdem generis may accurately express a legislative intent to narrow the meaning of otherwise more inclusive legislative language, we disagree that it

does so here.[34] First, it would unduly narrow the types of remedies available for a violation of § 46a-58, which, as we previously have indicated, contemplates a wide range of misconduct. Second, it would be inconsistent with the broad remedial purpose of the statute. Third, like the defendants' first contention, it renders superfluous the "includ[ing], but not be limited to" language contained in § 46a-86 (c). Fourth, and also like the defendants' first contention, it would ignore our reasoning in *Bridgeport Hospital* that the specific language of § 46a-86 (a), which does not include compensatory damages, is to be contrasted with the language of § 46a-86 (c), which does. Finally, as we have noted, the legislative history of P.A. 756, which added the language on which both the defendants and the dissent rely for the application of ejusdem generis, is devoid of any intent to adopt that doctrine, and, instead, suggests, by its references to the statute as being "protective of [the] human dignity and rights of every citizen of our state"; 12 H.R. Proc., supra, p. 5366, remarks of Representative Lavery; a broad interpretation, as opposed to the cramped interpretation offered by the dissent.

In this regard, we disagree with the defendants' reliance on our decision in *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, 201 Conn. 350, 364–66, 514 A.2d 749 (1986). In that case, the

---

[34] The dissent, like the defendants, places heavy reliance on the doctrine of ejusdem generis, asserting that "it could not be clearer, under the doctrine of ejusdem generis, that the legislature intended to limit recoverable damages to 'costs actually incurred' . . . by a complainant." (Citation omitted.) We agree that, *if* the doctrine applied in this instance, it could yield the conclusion that the dissent reaches. Ejusdem generis, however, is merely an axiom of statutory construction, not an inviolate rule of law; and, like all such axioms, it provides a "guideline to legislative meaning, but it cannot displace the result of careful and thoughtful interpretation." *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 460, 692 A.2d 742 (1997); see also *State* v. *Courchesne*, supra 262 Conn. 555. Although we present several reasons why the doctrine should not be applied in the present case, the dissent has presented no reasons why it must be applied.

respondent realty company had discriminated against the complainant on the basis of race in 1977, in violation of the Public Accommodation Act; General Statutes § 46a-64; by refusing to permit him to purchase a subdivision lot that was for sale. *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities,* supra, 354. The commission, in 1983, ordered the respondent to give the complainant an option to purchase a similar lot for the 1977 sale price. Id. We affirmed the trial court's reversal of the commission's order because "the purpose of actual damages *in a fair housing case* is to put the plaintiff in the same position, so far as money can do it, as he would have been had there been no injury or breach of duty, that is, to compensate him for the injury actually sustained." (Emphasis added; internal quotation marks omitted.) Id., 365. Thus, we stated that "measuring damages by the appreciation in land from the time of an alleged act of discrimination to the time of trial goes well beyond injuries actually sustained . . . [would result] in creating a windfall profit to the complainant . . . [and would be] punitive in nature . . . ." Id., 366. *Chestnut Realty, Inc.,* cannot support the defendants' position in the present case, however. First, this is not a fair housing case. Second, the discrimination in that case was under § 46a-64, the specific public accommodation law, not § 46a-58, the general and broadly inclusive civil rights statute. Third, the commission in *Chestnut Realty, Inc.,* did not make a general compensatory damage award under § 46a-86 (c); rather, the award was simply economic in nature, and the court was undoubtedly correct that an economic award cannot properly be punitive or result in a windfall to the complainant. Thus, the proper inquiry in *Chestnut Realty, Inc.,* was not *if* the complainant was entitled to damages, but rather, *how to measure* those damages—and measuring damages by the appreciation in land went beyond "the

damage suffered by the complainant" in that case. General Statutes § 46a-86 (c). That does not mean, however, that, in a case such as this, where there may be no economic harm, the commission may not award appropriate noneconomic damages, such as emotional distress. Indeed, as we have indicated, our reasoning in *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 232 Conn. 98, is plainly to the contrary.

The defendants' third contention is that there is nothing in the legislative history indicating a legislative intent to authorize general compensatory damages, such as emotional distress damages, under § 46a-86 (c). In this regard, the defendants focus, not on the legislative history of § 46a-86 (c), which, as we have indicated, does suggest such an intent, but, instead, on the legislative history of § 46a-58, and its statutory predecessor, General Statutes § 53-34. The short answer to this contention is that the absence of an expression in the legislative history of § 46a-58 to permit personal compensatory damages cannot survive that statute's specific inclusion, beginning in 1975, and continuing with its inclusion in the technical revision of 1980, to the list of statutory violations that will specifically permit the award of compensatory damages under § 46a-86 (c). Public Act 75-462; P.A. 80-422, § 34.

The defendants' final argument is that Ballard did not include a claim for compensatory damages, such as those for emotional distress, in his original complaint. This argument fails because a complaint to the commission is not like a complaint in a civil action filed in court. A complaint to the commission simply triggers the commission's evaluative, investigative and adjudicative functions. Thus, the formal requirements of pleading in civil actions filed in court do not apply to complaints filed with the commission. Indeed, as we have noted, the complainant need not have, and often

will not have, an attorney, as was the case here. Once the complaint is filed, it is the primary responsibility of the commission to evaluate it for sufficiency, investigate it, and, if mediation fails and probable cause is found, prosecute it. Moreover, in the present case, Ballard specifically requested "money damages" in his complaint. There is nothing in the applicable statutory scheme, or its purpose, that requires that the complaint spell out any particular form of relief that may be awarded, let alone any particular form of money damages.

## II

We now turn to the underlying jurisdictional issue in the present case, namely, whether the commission has jurisdiction over Ballard's complaint. The defendants claim, in their appeal, that the commission has no jurisdiction over a complaint alleging discrimination against a student in the public schools, and that the trial court's conclusion to the contrary was improper. Specifically, the defendants argue that exclusive administrative jurisdiction over such complaints lies with the state board pursuant to §§ 10-4b and 10-15c; see footnotes 3 and 4, respectively, of this opinion for the text of those statutes; and that, therefore, the commission has no jurisdiction over such a complaint pursuant to § 46a-58 (a). The commission contends, to the contrary, that § 46a-58 (a) gives the commission the authority to vindicate students' rights against discrimination in the public schools that are protected by § 10-15c. We conclude that the commission has authority, under § 46a-86 (c), to vindicate public school students' rights in the case of the type of racial discrimination alleged in the present case, namely, a discrete course of allegedly discriminatory conduct by school personnel and the local board of education, pursuant to § 46a-58 (a), on the basis of the protection of those rights by § 10-15c.

We begin with the language of § 46a-58 (a), which provides: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, *race*, sex, blindness or physical disability." (Emphasis added.) As we previously discussed, the statute uses broad and inclusive language. The repeated use in § 46a-58 (a) of the word "any"—"any person," "any other person," and "any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States"—indicates an intention to protect a broad and inclusive range of persons from broadly specified forms of discrimination by a broad and inclusive range of actors. Although the word "any" sometimes may, because of its context, mean "some" or "one" rather than "all," "[i]ts meaning in a given statute depends on the context and subject matter of the law." *Duguay* v. *Hopkins*, 191 Conn. 222, 229, 464 A.2d 45 (1983); see also *King* v. *Board of Education*, 203 Conn. 324, 334, 524 A.2d 1131 (1987) (as used, " 'any' " means " 'all' " or " 'every' "). We think that its repeated use here in the context of a remedial statute counsels a broad, rather than a narrow, meaning. *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 782, 739 A.2d 238 (1999) (remedial statutes to be construed liberally to effectuate legislative intent). Thus, the language strongly suggests that it applies to the alleged discrimination in the present case, namely, discriminatory conduct against a student on the basis of race in the public schools by a principal and local board of education in violation of § 10-15c. There is nothing in the statute's language to suggest an implied exception that would relate to the present case.

Furthermore, the broadly defined subject matter of the statute's protection, namely, the deprivation of all of the rights, privileges or immunities secured by both the state and federal laws and constitutions, strongly suggests that it applies to a discrete course of conduct constituting racial discrimination against a student in a public school by educational officials, in violation of § 10-15c. It is difficult to maintain that the language of this statute does not reach, and as the defendants and the dissent maintain, has *never* reached, any form of racial discrimination against a student by educational officials in a public school, when the legal source of that protection is a particular state statute, such as § 10-15c.[35]

The genealogy of § 46a-58 (a), which we already have discussed in part I B of this opinion, points strongly in the same direction, because it indicates a consistent history of the statute's retaining its core protection—the rights, privileges or immunities secured by the state or federal laws or constitutions—while expanding both the ways in which its core protection may be enforced and the types of discrimination to which it applies. The origin of § 46a-58 (a) lies in chapter LXXXVI of the 1884 Public Acts, which was entitled "An Act relating to Civil Rights," and provided: "Every person[36] who subjects or causes to be subjected any other person to the deprivation of any rights, privileges, or immunities secured or

---

[35] Indeed, the dissent ignores the express reference in § 46a-58 (a) that makes it a discriminatory practice to cause any person to be subjected to the deprivation of any rights secured by, among other things, the "laws of this state . . . ." Section 10-15c is a law of this state.

[36] The fact that the original version of § 46a-58 (a) began with "[e]very person" further supports our conclusion that the language of the statute should be interpreted broadly, rather than narrowly. "Every" is a common synonym for "any," as used in the sense of "all." *King* v. *Board of Education*, supra, 203 Conn. 334. Our research indicates that this was changed to "[a]ny person" in the 1930 revision of the General Statutes, but there is no indication that a substantive change was intended. General Statutes (1930 Rev.) § 6065.

protected by the constitution or laws of this state, or of the United States, on account of such person being an alien, or by reason of his color or race, shall be punished by a fine of not more than one thousand dollars, or by imprisonment not more than one year, or both." The act was codified almost verbatim as General Statutes (1887 Rev.) § 1418, with only stylistic changes.[37]

In 1967, as previously discussed in part I B of this opinion, the legislature amended General Statutes (Rev. to 1967) § 53-36 to give the commission the additional authority to award damages for violations of our statutes prohibiting discrimination with regard to public accommodations and professional licensing. See P.A. 756. This legislation was preceded by legislative history indicating that it have broad remedial consequences.

Then, in 1974, discrimination on the basis of sex was added to the list of prohibitions enumerated in General Statutes (Rev. to 1973) § 53-34, now § 46a-58. Public Acts 1974, No. 74-80.[38]

In 1975, Public Acts 1975, No. 75-462 was enacted. That enactment specifically amended General Statutes (Rev. to 1975) § 53-36, which was the precursor to § 46a-86 (c), to authorize the commission to exercise its powers upon a complaint of a violation of General Statutes (Rev. to 1975) § 53-34, which was the specific statutory predecessor of § 46a-58 (a).

The legislative history of this 1975 legislation is instructive. In explaining it to the House of Representa-

---

[37] In the 1887 codification, the language "on account of such person being an alien, or by reason of his color or race" was replaced with the language "on account of alienage, color, or race," and the language "by imprisonment" was replaced with the word "imprisoned." Compare Public Acts 1884, c. LXXXVI with General Statutes (1887 Rev.) § 1418.

[38] Public Acts 1974, No. 74-80, also changed the language "fined not more than one thousand dollars or imprisoned not more than one year or both" to "guilty of a class A misdemeanor," which did not alter the penalty imposable under the statute. See General Statutes §§ 53a-26 and 53a-42 (defining misdemeanors and setting penalties).

tives, Representative Thomas C. Clark described § 53-34, now § 46a-58, as "the Civil Rights Statute of the State of Connecticut," and explained that the act "would extend . . . the powers of the [commission] to enforce" violations of § 53-34. 18 H.R. Proc., Pt. 10, 1975 Sess., pp. 4808–4809. Representative Clark further explained that, "under the current [s]tatute, the [c]ommission has a right to receive complaints . . . for [a] violation of [§] 53-34, but it does not have the right to prosecute those to completion under its own laws. This Bill will enable [the commission] to do so." Id., p. 4809.

Thus, after this 1975 legislation, there can be no doubt that the legislature intended the commission to have its full panoply of powers to enforce the broad civil rights protections afforded by what is now § 46a-58. Furthermore, given the breadth of the language of that statute, the fact that it was legislatively regarded as our state's civil rights statute, and the fact that the history of the development of the battle against racial discrimination in this nation was so deeply rooted in constitutional litigation over public schools, we cannot impute an intention to the legislature that the broad language and the specific enforcement power in the commission would, nonetheless, not apply to a discrete course of conduct amounting to racial discrimination by educational officials in our own public schools. Accordingly, we conclude that since 1975, the commission has had the statutory authority to investigate and adjudicate such claims of racial discrimination against students by such officials in the public schools of this state.

In 1977, blindness and physical disability were added to § 46a-58 (a) as specifically protected conditions; Public Acts 1977, No. 77-278; and in 1980, religion and national origin were added as specifically protected classes. Public Acts 1980, No. 80-54. In 1980, the statute was transferred from title 53 of the General Statutes to

its current location in title 46a.[39] See P.A. 80-422, § 7; General Statutes (Rev. to 1981) § 46a-58 (a).

Two things stand out from this history. First, from the beginning, the language and purpose of § 46a-58 (a) have been consistently broad and inclusive. The statute has long been this state's fundamental civil rights statute, with a purpose to cast a broad net of protection

---

[39] The dissent infers from this 1980 legislation a legislative intent to exclude from the ambit of § 46a-86 (c) the authority to adjudicate complaints for a violation of § 10-15c. The dissent states that "if the legislature had understood § 46a-58 to include discrimination prohibited by other state statutes in 1975, then there would have been no need for it expressly to include §§ 46a-59 and 46a-64 in § 46a-86 (c) in 1980. . . . Section 10-15c is not listed in § 46a-86 (c) and was not among the discrimination statutes incorporated into title 46a in 1980." We reject this inference.

First, it is evident that the 1980 legislation was nothing more than a general codification and technical revision of the laws governing the commission, and that, therefore, it was not intended to make any substantive changes with regards to the commission's authority, either by inclusion or exclusion. See *Pollio* v. *Planning Commission*, 232 Conn. 44, 55, 652 A.2d 1026 (1995) ("[t]echnical amendments are not generally intended to effect substantive changes in the law"). Indeed the title of P.A. 80-422, "An Act Concerning a Technical Revision of the Statutes Concerning Human Rights and Opportunities," could not be more innocuous.

Second, the dissent's view that, by not including § 10-15c in the 1980 codification and technical revision, the legislature signaled an intent to exclude it from the authority of §§ 46a-58 and 46a-86 (c) is flawed because one could just as easily infer that, by *not* expressly *excluding* § 10-15c from § 46a-86 (c), the legislature intended § 10-15c, along with *other* state and federal statutes providing for specified protections against discrimination, including, but not limited to, §§ 46a-59 and 46a-64, to be included within the *general* language of § 46a-58, with its specific incorporation in 1975 into § 46a-86 (c). The fact is, in our view, that no legitimate inference of legislative intent—either to include or exclude § 10-15c—can be drawn from the 1980 legislation, and that all of the specific statutory references transferred from § 53-36 into § 46a-86 (c), by virtue of the technical revision, were transferred simply so that the statutes governing the commission could be located together.

Finally, the dissent's argument proves too much. If, as the dissent suggests, only those sections specifically referred to in § 46a-86 (c), such as §§ 46a-59 and 46a-64, can serve as the basis for relief under § 46a-86 (c), then the general terms of § 46a-58 would *always* be superfluous, and we do not ordinarily read statutes so as to render any part superfluous—particularly a broad civil rights statute.

for all persons from discrimination. Second, whenever the statute has been amended substantively, the effects of the amendments have been to give the commission the power to enforce the statute and to broaden its coverage so as to reach additional forms of discrimination. This history supports the interpretation that § 46a-58 (a) applies to racial discrimination against a public school student by his principal and board of education. Indeed, given the history of the civil rights movement in this nation, it would be anomalous to construe our state's fundamental civil rights statute to have had an implied exception for the type of racial discrimination involved in the present case, particularly when neither the language, the purpose nor the history of the statute suggests any such implied exception.

The defendants maintain, however, that the commission has no administrative jurisdiction over complaints regarding racial discrimination in the public schools because such jurisdiction lies exclusively with the state board pursuant to §§ 10-4b and 10-15c. See footnotes 3 and 4, respectively, of this opinion for the text of those statutes. More specifically, the defendants argue that: (1) the legislative histories of §§ 10-15c, 10-4b and 46a-58 indicate a legislative intent for §§ 10-15c and 10-4b, on the one hand, and § 46a-58 (a), on the other hand, to apply to different types of discrimination, with only §§ 10-15c and 10-4b specifically applying to public schools; (2) the specific provisions of § 10-15c prevail over the general provisions of § 46a-58; (3) legislative silence following the commission's rulings that it lacked such jurisdiction indicates a legislative approval thereof; and (4) the fact that the state board has the special expertise to resolve issues involving the public schools indicates a legislative intent to locate in the state board the exclusive jurisdiction over such complaints. We disagree.

Before addressing the defendants' arguments specifically, we note two factors that, in our view, cut across and undermine all of those arguments. The first factor involves the relative histories and genealogies of § 46a-58 (a), on the one hand, and §§ 10-15c and 10-4b, on the other hand.

As previously discussed, § 46a-58 (a) enjoys a long and distinguished pedigree as the fundamental civil rights statute of our state. In addition, in 1975, the legislature specifically gave the commission the authority to use its full powers to enforce the statute's prohibitions against discrimination, and that enactment carried with it the authority to investigate and, if necessary, adjudicate complaints of a specific course of conduct amounting to racial discrimination against students by educational officials in the public schools.

It is true, as the defendants point out, that § 10-15c has an equally long and distinguished pedigree establishing that, as a substantive matter, our public schools must be free of racial and other forms of discrimination. Chapter CVIII of the 1868 Public Acts provided in relevant part: "The public schools . . . shall be open to all persons . . . and no person shall be denied admittance to an instruction in any public school . . . on account of race or color . . . ." This act was first codified in 1875 as chapter II of the General Statutes, entitled "Duties of Towns." General Statutes (1875 Rev.) c. II, pp. 128–29. This commitment against discrimination in the public schools continued in the following genealogy: Public Acts 1877, c. LXIV; Public Acts 1884, c. LXVII; General Statutes (1887 Rev.) § 2118; Public Acts 1895, c. CXIX; Public Acts 1897, c. CI; Public Acts 1899, c. 54; General Statutes (1902 Rev.) § 2130; General Statutes (1918 Rev.) § 851; Public Acts 1921, c. 45; General Statutes (1930 Rev.) § 833; General Statutes (1931 Rev.) § 82a; General Statutes (1933 Rev.) § 157b; General Statutes (1935 Rev.) § 185c; General Statutes (1949 Rev.)

§ 1349. Following the renumbering of the General Statutes in 1958, General Statutes (1958 Rev.) § 10-15 first appeared, which provided in relevant part that the "public schools shall be open to all children over six years of age without discrimination on account of race or color . . . ." In 1975, with the enactment of No. 75-284 of the 1975 Public Acts, the legislature amended § 10-15 by adding "sex, religion or national origin" to race or color as protected classes.

In 1978, the legislature, by virtue of No. 78-218, §§ 9 and 10, of the 1978 Public Acts, transferred the prohibition against discrimination from § 10-15 to the newly created General Statutes (Rev. to 1979) § 10-15c, which provided in relevant part: "The public schools shall be open to all children five years of age and over without discrimination on account of race, color, sex, religion or national origin . . . ." In 1979, the legislature amended § 10-15c by adding the provision that "each such child shall have an equal opportunity to participate in the activities, programs and courses of study in . . . public schools" without discrimination. Public Acts 1979, No. 79-128, § 12; General Statutes (Rev. to 1980) § 10-15c. In 1980, § 10-15c was again amended to require public school authorities to advise students of their rights to receive an equal educational opportunity without discrimination; Public Acts 1980, No. 80-405, § 1; General Statutes (Rev. to 1981) § 10-15c; and in 1997, the legislature added sexual orientation to the classes of students protected from discrimination. Public Acts 1997, No. 97-247, § 6; General Statutes § 10-15c.

Section 10-15c, however, whether in its original form or in its current form, has never contained a specific remedy or set of remedies for a violation of its proscriptions against discrimination. For that, as the defendants acknowledge, we must turn to § 10-4b. That statute's pedigree, however, is less lengthy and distinguished than that of § 10-15c.

The statutory predecessor to § 10-4b was derived from No. 690 of the 1969 Public Acts. Section 1 of Public Act 690 provided that "the educational interests of the state shall include, but not be limited to, the concern of the state (1) that each child shall have . . . equal opportunity to receive a suitable program of educational experiences; (2) that each school district shall [maintain a suitable level of finances for] this end; and (3) that the mandates in the general statutes pertaining to education within the jurisdiction of the state board of education be implemented."[40] Section 5 of Public Act 690 provided that, whenever the state board found that a local board of education had failed to make reasonable provisions "to implement the educational interests of the state as defined in section 1 of this act, [the] state board shall conduct an inquiry to identify the cause of [the] failure and shall determine what recommendations should be made as to the necessary remedies to be pursued by the responsible local or state agencies. . . ." Section 5 of Public Act 690 also provided that the local board would have the opportunity to be heard, and that the state board would have the power of subpoena for persons and records "pertinent to the inquiry . . . ."[41]

---

[40] Public Act 690, § 1, is now codified, as amended, at General Statutes § 10-4a, which provides: "For purposes of sections 10-4, 10-4b and 10-220, the educational interests of the state shall include, but not be limited to, the concern of the state that (1) each child shall have for the period prescribed in the general statutes equal opportunity to receive a suitable program of educational experiences; (2) each school district shall finance at a reasonable level at least equal to the minimum expenditure requirement pursuant to the provisions of section 10-262j an educational program designed to achieve this end; (3) in order to reduce racial, ethnic and economic isolation, each school district shall provide educational opportunities for its students to interact with students and teachers from other racial, ethnic, and economic backgrounds and may provide such opportunities with students from other communities; and (4) the mandates in the general statutes pertaining to education within the jurisdiction of the State Board of Education be implemented."

[41] Public Act 690, § 5, provided: "Whenever said state board finds that a board of education of any school district has failed to make reasonable

Two things are noteworthy about these two provisions. First, the generality of the definition of the state's educational interests, although certainly broad enough to encompass and certainly intended to encompass, substantive prohibitions against discrimination, by their very generality, lacked any focus on individual claims of discrimination. Second, and more important, § 5 of Public Act 690, which was the only specific remedial section, limited the state board's functions to (1) investigating a possible failure of a local school district to make reasonable provisions to implement those generally defined interests, and (2) making a *recommendation* to the local board of education "as to the necessary remedies to be pursued by the responsible local" board of education. Thus, the state board had no enforcement power of its own; rather, that power was solely to recommend remedial action to the local board.

In 1979, however, the legislature enacted No. 79-128 of the 1979 Public Acts. Section 14 of Public Act 79-128 amended General Statutes (Rev. to 1979) § 10-4b to a form essentially the same as it is today. See footnote 3 of this opinion for the text of § 10-4b. In general terms, subsection (a) of § 10-4b provides that any resident, or parent or guardian of a student, of a local school district, who has failed to resolve his complaint with his local board of education, may file a complaint with the state board[42] alleging a failure of the local board to comply

provision to implement the educational interests of the state as defined in section 1 of this act, said state board shall conduct an inquiry to identify the cause of such failure and shall determine what recommendations should be made as to the necessary remedies to be pursued by the responsible local or state agencies. In conducting such inquiries, the state board of education shall give the board of education involved the opportunity to be heard. Said state board may summon by subpoena any person whose testimony may be pertinent to the inquiry and any records or documents related to the provision of public education in the school district."

[42] The state board may also file its own complaint. General Statutes § 10-4b (a).

with the state's educational interests as defined in General Statutes § 10-4a. If the state board finds the complaint to be substantial, it then initiates an investigation by an agent of the state board, who has subpoena power. If the agent finds reasonable cause, the state board, which also has subpoena power, then conducts an inquiry, at which the local board has the power to be heard, under General Statutes §§ 4-176e through 4-184 of the UAPA.

Subsection (b) of § 10-4b then provides, in general terms, insofar as this case is concerned, that if the state board finds that the local board has failed to provide educational opportunities to meet the requirements of law, specifically including § 10-15c, the state board shall require the local board "to engage in a remedial process . . . [to] develop and implement a plan of action through which compliance may be attained . . . ." If the state board finds that the local board "is responsible for [the] failure," it may order the local board "to take reasonable steps to comply with the requirements of section 10-4a. . . ." General Statutes § 10-4b (b).

Under subsection (c) of § 10-4b, the state board may seek an order from the Superior Court if the local board fails to carry out the order of the state board. Under subsection (d), the state board is charged with the duty to adopt procedural regulations for the purposes of § 10-4b, which it has done.

A comparison of these two sets of legislative histories, namely, that of § 46a-58 (a), on the one hand, and that of §§ 10-15c and 10-4b, on the other hand, discloses two factors that buttress our conclusion that §§ 10-15c and 10-4b do not provide the exclusive administrative route for remedying specific acts of racial discrimination against a student in a public school by his principal and local board of education, to the exclusion of the commission operating under §§ 46a-58 and 46a-86 (c).

First, the generality and lack of focus on individual claims of discrimination disclosed by the state board's statutory authority, and the lack of genuine enforcement power in the state board, from 1969 to 1979, suggest that it is unlikely that the legislature intended it to be the exclusive remedial administrative agency for a claim of racial discrimination in the public schools. This is to be contrasted with the legislative grant of authority to the commission in 1975 of its full powers to enforce § 46a-58, pursuant to § 46a-86 (c), with its specific references to racial and other forms of discrimination. This contrast, moreover, reinforces our conclusion, stated previously, that the grant in 1975 to the commission was intended to carry with it the authority to investigate and adjudicate such claims.

Second, having concluded that the 1975 legislation afforded the commission the authority to adjudicate claims of racial discrimination against students in the public schools, in order for us to conclude that, nonetheless, §§ 10-15c and 10-4b provide the exclusive administrative remedy for such claims, we would be required to conclude also that, when the legislature amended § 10-4b in 1979, as previously discussed, it also intended to amend §§ 46a-58 and 46a-86 (c) by implication, thus implicitly exempting from those sections the very authority to adjudicate such claims that it had granted four years earlier, in 1975. Our ordinary presumptions are strongly against amendment by implication; we do not interpret statutes to do so, except where there are very strong indications of legislative intent to do so. *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 242, 756 A.2d 1264 (2000). The legislative history of Public Act 79-128 indicates that its main impetus was as part of the legislative response to this court's decision in *Horton* v. *Meskill*, 172 Conn. 615, 648–49, 376 A.2d 359 (1977), in which we held the state's educational funding formula unconstitutional under our state con-

stitution. See generally 22 H.R. Proc., Pts. 11 and 12, 1979 Sess., pp. 3678–3944; 22 S. Proc., Pts. 11 and 12, 1980 Sess., pp. 1636–1801; Conn. Joint Standing Committee Hearings, Education, Pts. 1 and 2, 1980 Sess., pp. 3–11, 65–67, 70–72, 82, 163–65, 181, 195, 243–90, 302, 497–506, 530–36. There is nothing in the public act's language or voluminous legislative debate indicating an intention to amend §§ 46a-58 or 46a-86 (c), or to make § 10-4b the exclusive remedy for individual claims of racial discrimination. Given that § 46a-58 is our state's fundamental civil rights statute, given its long pedigree as such, and given that there is no indication, in either the language of § 10-4b or the legislative debate preceding the 1979 legislation regarding § 10-4b, we see no basis for such a conclusion of implicit amendment.

The second factor cutting across all of the defendants' arguments is the absence from the text of either §§ 10-15c or 10-4b of any linguistic indication that the state board is intended to be the exclusive remedial administrative agency for claims of racial discrimination in the public schools. Although there is no talismanic phrase that is necessary to establish exclusive statutory jurisdiction over a particular subject matter, we are ordinarily reluctant to infer exclusivity of remedy from an ambiguous remedial statute. See *Jones* v. *Mansfield Training School*, 220 Conn. 721, 729–30, 601 A.2d 507 (1992). A fortiori, we should be reluctant to infer exclusivity by way of implicit amendment of a remedial statute.

Indeed, the commission brings to our attention numerous instances in which the legislature has made clear by explicit legislative language its intention to confer exclusive jurisdiction in various contexts. See General Statutes § 10-153e (g) (3) ("[t]he jurisdiction of the Superior Court shall be exclusive"); General Statutes § 13b-26 (b) ("[commissioner of transportation] shall exercise exclusive jurisdiction over all such high-

ways"); General Statutes § 15-121 (a) ("Commissioner of Environmental Protection shall . . . have exclusive jurisdiction of all waters of the state"); General Statutes § 16-50x (a) ("the [Connecticut siting] council shall have exclusive jurisdiction over the location and type of facilities"); General Statutes § 16-243 ("[t]he Department of Public Utility Control shall have exclusive jurisdiction . . . over the method of construction"); General Statutes § 22a-124 (a) ("the [Connecticut siting] council shall have exclusive jurisdiction over the siting of facilities"); General Statutes § 22a-163n (a) (same); General Statutes § 22a-348 (a) ("the [commissioner of environmental protection] shall have exclusive jurisdiction over any encroachments"); General Statutes § 26-103 ("wildlife habitats and shall be under the exclusive jurisdiction and control of the Commissioner of Environmental Protection"); General Statutes § 26-192 (statute governing shellfisheries titled: "Exclusive jurisdiction of state"); General Statutes § 26-194 (a) ("all shellfish areas . . . within the exclusive jurisdiction of the state"); General Statutes § 26-195 ("shellfish grounds within the exclusive jurisdiction of the state"); General Statutes § 26-196 ("shellfish grounds . . . within the exclusive jurisdiction of the state"); General Statutes § 26-203 ("oyster beds in the exclusive jurisdiction of this state"); General Statutes § 26-207 ("shellfish . . . franchises lying within the exclusive jurisdiction of the state"); General Statutes § 26-211 ("oyster grounds within the exclusive jurisdiction of the state"); General Statutes § 26-246 ("oyster grounds within the exclusive jurisdiction of the state"); General Statutes § 26-257 (various towns granted "exclusive jurisdiction" over certain shellfish beds); General Statutes § 29-349 (a) ("[t]he Commissioner of Public Safety shall have exclusive jurisdiction in the preparation of . . . explosives and blasting agents"); General Statutes § 31-63 ("jurisdiction of the court shall be exclusive"); General Stat-

utes § 31-109 (c) ("jurisdiction of the Superior Court shall be exclusive"); General Statutes § 33-871 (d) ("jurisdiction of the court . . . is . . . exclusive"); General Statutes § 33-898 (a) ("court appointing a receiver or custodian has exclusive jurisdiction"); General Statutes § 33-1189 (a) (same); General Statutes § 36a-187 (b) ("superior court for the judicial district of Hartford . . . vested with exclusive jurisdiction"); General Statutes § 38a-907 (a) (4) ("[a]ll matters . . . within the exclusive jurisdiction of the domiciliary receivership court"); General Statutes § 46a-95 (i) ("jurisdiction of the court shall be exclusive"); General Statutes § 46b-42 ("Superior Court shall have exclusive jurisdiction of all complaints seeking a decree of annulment, dissolution of a marriage or legal separation"); General Statutes § 46b-115*l* (a) ("court . . . which has made a child custody determination . . . has exclusive, continuing jurisdiction"); General Statutes § 46b-212h (a) ("Family Support Magistrate Division or the Superior Court . . . has continuing exclusive jurisdiction over a child support order"); General Statutes § 46b-212j (d) ("tribunal that issued an order . . . is the tribunal having continuing, exclusive jurisdiction"); General Statutes § 46b-213q (d) ("Family Support Magistrate Division becomes the tribunal of continuing exclusive jurisdiction"); General Statutes § 47a-55 (a) ("town, city or borough may . . . designate another authority or authorities to exercise concurrent or exclusive jurisdiction"); General Statutes § 48-1 (a) ("[e]xclusive jurisdiction in and over any land . . . ceded to the United States"); General Statutes § 51-352c (b) ("town or judicial district . . . shall have exclusive jurisdiction to charge, present, indict, try, convict and sentence"); General Statutes § 52-12 (a) ("Superior Court shall have exclusive jurisdiction of all matters relating to the sale of real property"). In view of this compelling evidence of an obvious legislative ability to use appro-

priate *explicit* language to confer exclusive jurisdiction, and in view of the fundamental and remedial nature of the protections afforded by § 46a-58, we decline to interpret §§ 10-15c and 10-4b as *implicitly* granting exclusive jurisdiction to the state board over claims of racial discrimination against students in the public schools.

In addition, there is nothing legislatively unusual about there being separate and independent remedies for racial and other types of discrimination, concurrent with those afforded by the commission under its statutory scheme. For example, in the area of employment discrimination, both General Statutes §§ 5-227[43] and 46a-60[44] cover similar situations, yet may be brought to different fora. Similarly, General Statutes §§ 10-153[45] and 46a-60, both cover discrimination against teachers on the basis of sex or marital status.

In light of these considerations, we are not persuaded by the defendants' argument that the specific provisions of §§ 10-15c and 10-4b should prevail over the more general provisions of §§ 46a-58 and 46a-86 (c). In this connection, the defendants' and the dissent's reliance on *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, supra, 238 Conn. 337, is

---

[43] General Statutes § 5-227 provides: "No person in the classified service or seeking admission thereto may be appointed, demoted or dismissed or be in any way favored or discriminated against because of his political opinions or affiliations or as the result of a discriminatory employment practice as defined in section 46a-51. No question in any application, questionnaire, examination or other evaluation form used in connection with carrying out the provisions of this chapter may relate to political or religious opinions or affiliations of any applicant or eligible person on any candidate or reemployment list established and maintained by the Commissioner of Administrative Services."

[44] See footnote 32 of this opinion for the text of § 46a-60 (a) (1).

[45] General Statutes § 10-153 provides: "No local or regional board of education shall discriminate on the basis of sex or marital status in the employment of teachers in the public schools or in the determination of the compensation to be paid to such teachers."

misplaced. The question in that case was whether the specific claims of employment discrimination covered by § 46a-60 were also covered by the general terms of § 46a-58 (a). Id., 340. We held that the separate sets of remedies provided by § 46a-86 (b) and (c) indicated that "the specific, narrowly tailored cause of action embodied in § 46a-60 supersedes the general cause of action embodied in § 46a-58 (a)." Id., 346. Both of those types of claims, however, were within the jurisdiction of the commission, and the question was which set of remedies the commission could employ. That decision does not inform the question in the present case, in which the debate is over whether the commission has concurrent jurisdiction with the state board or whether the state board has exclusive jurisdiction.

Furthermore, the provisions of § 46a-60; see footnote 32 of this opinion; governing discriminatory employment practices, cover no less than two subsections containing eleven and four subdivisions, respectively. In *Truelove & Maclean, Inc.*, we determined that the "narrowly tailored" provisions of § 46a-60 trump the "general cause of action embodied in § 46a-58 (a)." *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, supra, 238 Conn. 346. By contrast, *both* §§ 46a-58 (a) and 10-15c are general in their terms, and the only specific subject matter in § 10-15c that does not appear in § 46a-58 is its application to public school students. Section 10-15c, therefore, is not "narrowly tailored" as is § 46a-60. Id. In addition, the axiom that a specific statutory provision will ordinarily trump a general statutory provision cannot, by itself, displace the process of thoughtful and complete statutory interpretation. *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 460, 692 A.2d 742 (1997). Thus, that axiom does not appropriately apply in the present case.

We are also not persuaded by the defendants' and the dissent's contention that legislative silence in the wake of the commission's rulings that it had no jurisdiction over claims like Ballard's indicates legislative approval thereof. This contention rests on the following brief history. In 1980, a commission hearing examiner concluded that, as between § 10-15c and General Statutes (Rev. to 1980) § 53-35, now § 46a-64, the public accommodations statute, § 10-15c was " 'the operative antidiscrimination statute,' " that "[n]othing suggests that the legislature intended to vest any enforcement authority for § 10-15c in the [commission] or to incorporate or to utilize the mechanism of chapter 563 [now § 46a-58] in such enforcement," and that the "commission [has] no jurisdiction in or responsibilities over discrimination in access to public school activities and programs . . . ." *Atlas* v. *Hamden High School*, Commission on Human Rights & Opportunities, Opinion No. 7930381 (August 20, 1980). The next pronouncement by the commission was the decision of the referee in the present case, twenty years later, and a similar decision decided contemporaneously with this case. See *Alston* v. *Board of Education*, Commission on Human Rights & Opportunities, Opinion No. 9830205 (May 3, 2000). This history is unpersuasive. First, there is no evidence in the record of any intervening actions by the commission on such complaints. Second, there is nothing in any of the intervening legislation or its history indicating any legislative awareness or approval of these decisions, either explicit or implicit. Third, just as the legislature was silent after the commission decision twenty years ago, it has been silent after the trial court's decision in the present case more than two years ago. Thus, this legislative silence is, as it often is, ambiguous, and an unreliable indicator of legislative intent.[46] See *State* v.

---

[46] Although we are mindful of this court's statements that legislative silence may express a concurrence with an agency's interpretation of existing law; see, e.g., *Berkley* v. *Gavin*, 253 Conn. 761, 786, 756 A.2d 248 (2000) ("[w]hen the legislature is aware of an agency's interpretation of a statute and is

*Reynolds*, 264 Conn. 1, 79, 836 A.2d 224 (2003) ("[R]eliance on legislative silence is misplaced. It is a basic tenet of statutory construction that we rely on the intent of the legislature as that intent has been expressed." [Internal quotation marks omitted.]); *Craig* v. *Driscoll*, 262 Conn. 312, 327, 813 A.2d 1003 (2003) (legislative silence is no more likely to reflect implied adoption of one rationale over another).

We are similarly unpersuaded by the defendants' contention that the state board's expertise regarding the public schools indicates a legislative intent to confer exclusive jurisdiction on it in the present case. Although we do not deny the state board's expertise over matters involving the public schools, and that such expertise would certainly cover claims of various forms of discrimination, we also recognize the commission's expertise over such claims. Indeed, we have implicitly recognized that expertise in the closely related area of claims of racial discrimination against a teacher. See, e.g., *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 510–17, 832 A.2d 660 (2003). The point here is not that the state board does not have such expertise; the point is that its expertise is not exclusive of that of the commission so as to warrant an inference of a legislative intent to vest exclusive jurisdiction in the state board.

Finally, we do not agree with the defendants that interpreting our entire statutory scheme, regarding the type of claimed racial discrimination against a public

silent concerning that interpretation, this court construe[s] the legislative silence as legislative concurrence in that interpretation" [internal quotation marks omitted]); *Connecticut Light & Power Co.* v. *Public Utilities Control Authority*, 176 Conn. 191, 198, 405 A.2d 638 (1978) ("inference of legislative concurrence with the agency's interpretation [is] to be drawn from legislative silence concerning that interpretation, especially where the legislature makes unrelated amendments in the same statute"); based on the foregoing discussion, this is not an appropriate instance in which to make such an assumption.

school student in the present case, so as to vest concurrent jurisdiction in both the state board and the commission, will render the state board's jurisdiction superfluous. An individual complainant may prefer to take the state board route, rather than the commission complaint route, for various reasons. First, the availability of remedies may differ depending on whether the commission or the state board pursues the claim. Whereas the tenor of § 10-4b (b) is concerned with corrective or prospective measures, namely, "requir[ing] the local or regional board of education to engage in a remedial process . . . [and] implement[ing] a plan of action through which compliance may be attained," § 46a-86 (c) is more concerned with compensatory measures to remedy past discrimination, namely, "the damage suffered by the complainant . . . ."[47] In this regard, the state board under §§ 10-4b and 10-15c may be better suited to address, say, a large-scale systemic problem that plagues a school system generally, and the commission under § 46a-86 (c) may be better suited to address, say, a discrete course of discriminatory conduct aimed at a particular individual. In addition, a complainant may choose not to seek any compensatory damages at all, and would prefer, for whatever reason, the more prospective measures available under § 10-4b. That will be his or her choice, however; but the fact of a choice does not render the alternate route superfluous. Furthermore, as we noted previously, the state board does not have to await such a complaint by an individual complainant; it may initiate such a complaint on its own under § 10-4b. Moreover, contrary to the defendants' suggestion, giving an individual such a choice will not necessarily mean that he or she could concurrently

---

[47] We need not, and do not, however, express any opinion on whether the state board may, as part of its remedial powers, require a local board to provide some form of compensation to an individual student who has been the victim of a discrete course of discriminatory conduct by agents of a public school.

pursue both simultaneously, thus requiring the local board or its personnel to defend themselves in two different fora. The judicial doctrine of election of remedies would always be available to forestall such an inconvenient and wasteful result. See, e.g., *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs*, 225 Conn. 804, 809 n.6, 626 A.2d 729 (1993); *Grant* v. *Bassman*, 221 Conn. 465, 472 n.7, 604 A.2d 814 (1992).

Finally, we address the dissent's contention that, under our " 'broad and inclusive' reading of §§ 46a-58 and 46a-86 (c) in the present case, each student in the Hartford public schools would have a claim for damages against the state for the emotional distress caused by his or her racial isolation and perhaps for the costs of obtaining an alternate education up to the time that the discriminatory conditions are remedied . . . ." We do not suggest any such thing, and nothing in this opinion should be taken as doing so.

First, as we have indicated, this case involves only a discrete course of allegedly discriminatory conduct by an identified school official against the complainant, in violation of specific state statutes, namely, §§ 10-15c and 46a-58 (a). It does not present the type of systemic racial isolation that this court found unconstitutional, under our state constitution, in *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A.2d 1267 (1996). Our holding that the type of discriminatory conduct alleged in the present case is within the commission's authority to remedy under § 46a-86 (c) does not imply that the commission would also, ipso facto, have the same authority to order damages for any Hartford public school student under the authority of *Sheff*. Indeed, precisely because of the factors identified by the dissent, namely, that claims of systemic racial isolation in the public schools involve highly complex, sensitive and controversial social and political questions involving multiple governmental par-

ties and large numbers of students, we are highly dubious that the language of §§ 46a-58 and 46a-86 (c), when read together with all other sources of its meaning such as its history, purposes and statutory context, as we are required to do, would be broad and inclusive enough to permit such a result.

Second, and even more important, and contributing heavily to our serious doubt about the reality of the dissent's fears, we note that, in *Sheff*, this court specifically left to the legislature and the executive branch the initial task of fashioning the remedies for the state constitutional violation identified therein; see *Sheff* v. *O'Neill*, supra, 238 Conn. 45–46; and we also note that both branches of our government have been attempting ever since to accomplish that very difficult task. In March, 1999, the Superior Court described the various efforts made as of that date, which included the following: Executive Order No. 10, creating the educational improvement panel; Public Acts 1997, No. 97-290; increased funding by the state of interdistrict cooperative programs; increased funding by the state of interdistrict magnet schools; amendment of the statutes regarding charter schools; increased recruitment of minority staff members in the public schools; establishment of and funding for a school choice program; and the establishment of intradistrict "lighthouse schools," viewed as potential predecessors of magnet schools. *Sheff* v. *O'Neill*, 45 Conn. Sup. 630, 634–49, 733 A.2d 925 (1999). Since then, these executive and legislative efforts have continued, and, as the dissent notes, the parties have now entered into some form of judicially approved settlement of the outstanding remedial issues.

What is significant about this historical aftermath of *Sheff* is the total absence of any legislative, executive or judicial indication that the commission would have any role, pursuant to §§ 46a-58 or 46-86 (c), or other-

wise, in that remedial scheme.[48] To say the least, we would be hard pressed, if faced with the type of claim that the dissent posits, to ignore this history and hold, despite it, that nonetheless our conclusion in this very different case, on a different set of facts and a different legal basis, implies or even suggests that a public school child could use this decision as a springboard for emotional distress and other damages based upon a violation of his rights under the ruling in *Sheff*. In fact, that very history would counsel strongly, perhaps even conclusively, to the contrary. The dissent's contention, therefore, is simply without basis.

The judgment of dismissal regarding Ballard's complaint is reversed; the judgment is affirmed in all other respects.

In this opinion NORCOTT, KATZ, PALMER and VERTEFEUILLE, Js., concurred.

SULLIVAN, C. J., with whom ZARELLA, J., joins, dissenting. I agree with the majority that the trial court's remand to the plaintiff, the commission on human rights and opportunities (commission), was a final judgment for purposes of our appellate jurisdiction. I disagree, however, with the majority's analysis of that issue. I

---

[48] Our reliance on legislative silence with respect to the commission in this context is not inconsistent with our rejection of the defendants' contention that legislative silence following the commission's 1980 ruling that it had no jurisdiction over claims like Ballard's indicates legislative approval thereof. See *Atlas* v. *Hamden High School*, supra, Commission on Human Rights & Opportunities, Opinion No. 7930381. Without discounting the importance of the rulings issued by the commission, it suffices to say that an unpublished administrative ruling ordinarily does not garner the same sort of legislative awareness as does a decision by this court declaring unconstitutional the educational system of the Hartford school district. In this regard, whereas there is no evidence that the legislature was aware of the commission's decision in *Atlas*, the legislature undoubtedly was aware of, and has responded to, our decision in *Sheff*. Thus, the legislative silence following *Atlas* is not analogous to the legislative silence with respect to the commission following *Sheff*.

also disagree that the commission has jurisdiction over claims arising under General Statutes § 10-15c[1] alleging discrimination in a public school setting. In light of my conclusion that the commission has no jurisdiction over the case, I would not reach the question of whether this appeal is moot as to Chillon Ballard. Nevertheless, for reasons stated more fully later in this dissenting opinion, I believe that it is necessary for me to address the majority's flawed analysis of that issue. Because I disagree with the majority's conclusion that the commission has jurisdiction over claims arising under § 10-15c, I respectfully dissent.

I

I first address the majority's analysis of the final judgment issue. I am not entirely convinced by the majority's interpretation of *Lisee* v. *Commission on Human Rights & Opportunities*, 258 Conn. 529, 782 A.2d 670 (2001), and *Morel* v. *Commissioner of Public Health*, 262 Conn. 222, 811 A.2d 1256 (2002), as holding that remands after rulings on the merits of an administrative appeal pursuant to General Statutes § 4-183 (j)[2] are subject on a case-by-case basis to the final judgment test set forth in *Schieffelin & Co.* v. *Dept. of Liquor Control*, 202 Conn. 405, 521 A.2d 566 (1987). I recognize that, in *Lisee*, this court stated, in what the majority now characterizes as dicta, that "the legislature intended to codify [*Schieffelin & Co.*] as it applies to remands after rulings on the merits of an administrative appeal." *Lisee* v. *Commission on Human Rights & Opportunities*, supra, 541–42. I believe, however, that, in the context of the entire opinion, that language in *Lisee* reasonably can be read to mean that § 4-183 (j) implemented our general holding in *Schieffelin & Co.* that some administrative rulings involving remand orders are final judg-

---

[1] See footnote 4 of the majority opinion for the text of § 10-15c.

[2] See footnote 10 of the majority opinion for the text of § 4-183 (j).

ments, namely, those arising under § 4-183 (j), and some are not, namely those arising under § 4-183 (h).[3] See *Schieffelin & Co.* v. *Dept. of Liquor Control*, supra, 410. I am not convinced that we intended to suggest that remand orders under § 4-183 (j) are subject to the *Schieffelin & Co.* final judgment test despite the plain language of that subsection that "[f]or purposes of this section, a remand is a final judgment." General Statutes § 4-183 (j). I also believe that there are inconsistencies between *Morel* and *Schieffelin & Co.* that would suggest that, in light of the broad language of § 4-183 (j), this court in *Morel* applied the *Schieffelin & Co.* final judgment test far more leniently than had the court in *Schieffelin & Co.*[4] Nevertheless, because I agree with the majority that, regardless of this court's interpretation of § 4-183 (j) in *Lisee* and *Morel,* all remand orders after the trial court has found prejudice and sustained the appeal are final judgments, I see no need to engage in a lengthy analysis of those cases.

I object, however, to the majority's use of the legislative history of § 4-183 (j). Although, as we recognized in *Lisee,* the last sentence of § 4-183 (j) is ambiguous as to whether it refers to any and all rulings under other subsections of § 4-183 that can fairly be characterized as remands, it unambiguously provides that all remands arising under § 4-183 (j) are final judgments.[5] Accord-

---

[3] See footnote 9 of the majority opinion for the text of § 4-183 (h).

[4] In *Schieffelin & Co.*, this court determined that the trial court's ruling sustaining the plaintiff's claim on appeal that certain termination notices issued to the defendants met the statutory requirement and remanding the case to the agency for a ruling on the merits was not a final judgment. *Schieffelin & Co.* v. *Dept. of Liquor Control*, supra, 202 Conn. 407, 412. In *Morel,* this court determined that the trial court's ruling sustaining the plaintiff's claim on appeal that the agency had applied an improper standard and remanding the case to the agency so that it could apply the proper standard was a final judgment. *Morel* v. *Commissioner of Public Health*, supra, 262 Conn. 227, 232. If there is a difference between these trial court rulings justifying these disparate results, it is beyond my powers of discernment.

[5] We recognized in *Lisee* that the word "remand" as used in the last sentence of § 4-183 (j) was ambiguous as it applied to orders issued under

ingly, I believe that we are barred by No. 03-154, § 1, of the 2003 Public Acts[6] from consulting the legislative history of the statute.[7]

## II

I next turn to the majority's analysis of the question of mootness as to Ballard. The defendants argue that,

other subsections of § 4-183 that fairly could be characterized as remands but which were not issued after the court had found prejudice and sustained the appeal. We concluded that the word "remand" did not refer to such orders, but referred only to the remands described in § 4-183 (j). *Lisee* v. *Commission on Human Rights & Opportunities*, supra, 258 Conn. 539 ("the remand referred to in the last sentence is the remand referred to in the preceding sentence, namely, a remand upon *sustaining the appeal*" [emphasis in original]).

The majority states that my statement that the last sentence of § 4-183 (j) is plain and unambiguous as it applies to remands under that subsection is "plainly wrong," because if the phrase "this section" were read literally, it would apply to all remands under § 4-183, not just to remands under subsection (j). It is the majority's logic, however, that is plainly wrong. First, as I have noted, the ambiguity in § 4-183 (j) is in the word "remand," not the word "section." Second, the fact that the statute is ambiguous in some applications does not mean that it is ambiguous in all applications. For example, the fact that a statute that requires the leashing of dogs is ambiguous as it applies to dingos does not mean that it is ambiguous as it applies to cocker spaniels. Thus, the question is not whether the *literal meaning* of the last sentence of § 4-183 (j) is plain and unambiguous in some absolute sense; the question is whether the sentence plainly and unambiguously applies to remand orders arising under subsection (j). I believe that it does and nothing in *Lisee* or *Morel* suggests otherwise. At most, those cases suggest that the *Schieffelin & Co.* test applies to remands arising under § 4-183 (j) *despite* the plain meaning of the statute. In my view, that is why those cases should be overruled.

[6] See footnote 20 of the majority opinion for the text of Public Acts 2003, No. 03-154.

[7] Even if I did not believe that we are barred from consulting the statute's legislative history, I would not agree with the majority's analysis of that history. With respect to the majority's reliance on the Law Revision Commission Report, in my view, the portion of the report cited by the majority merely recites the language of the statute that a remand for further proceedings after sustaining the appeal is a final judgment. See 1987 Thirteenth Annual Report of the Connecticut Law Revision Commission to the General Assembly, March, 1988, p. 40. It provides no additional insight into the meaning of that provision. The majority also states that the report's reference to *Watson* v. *Howard*, 138 Conn. 464, 86 A.2d 67 (1952), "belies any intention to codify the *Schieffelin & Co.* test, because *Watson* was a case in which the trial court's remand was held to be a final judgment, despite the fact that it most likely would not have satisfied the *Schieffelin & Co.* test." *Schieffelin & Co.*,

if this court determines that the commission has jurisdiction over the claim, the commission's appeal is moot as to Ballard because General Statutes § 46a-86 (c)[8] does not provide for the recovery of damages for emotional distress. Because I would conclude that the commission does not have jurisdiction over claims arising under § 10-15c, I would not reach this issue. I address the majority's analysis of the mootness claim, however, because I believe that that analysis is flawed and leads to an erroneous conclusion that will have adverse consequences far beyond this case.

The majority begins its analysis of this claim not with the language of § 46a-86 (c), but with the language of General Statutes § 46a-58 (a).[9] It notes that § 46a-58 (a) has "broad and inclusive language, and strongly suggests a reference to the broad and inclusive panoply of rights, privileges and immunities, derived from a broad and inclusive set of sources . . . ."[10] The major-

however, expressly cited the trial court's ruling in *Watson* as the paradigm of an administrative ruling that constitutes a final judgment. *Schieffelin & Co.* v. *Dept. of Liquor Control*, supra, 202 Conn. 410. Accordingly, it appears to me that, not only does the report offer no support for the conclusion that § 4-183 (j) was not intended to codify *Schieffelin & Co.*, it arguably undermines that conclusion.

[8] See footnote 16 of the majority opinion for the text of § 46a-86 (c).

[9] General Statutes § 46a-58 (a) provides: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, blindness or physical disability."

[10] I am somewhat perplexed by this statement. In my view, the statute does not *suggest* a "broad and inclusive panoply of rights, privileges and immunities, derived from a broad and inclusive set of sources . . . ." Rather, it expressly identifies specific misconduct, i.e., the "deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States"; General Statutes § 46a-58 (a); that gives rise to the specific remedies identified in §§ 46a-58 (d) and 46a-86 (c). I conclude in part III of this dissenting opinion that, although the language of § 46a-58 is broad, it is not inclusive of all discriminatory conduct. Specifically, the statute does not, in my view, incorporate other state laws prohibiting specific types of discrimination. For purposes of this portion of the

ity infers from this fact that the phrase "the damage suffered by the complainant," as used in § 46a-86 (c), "need not necessarily be confined to easily quantifiable monetary losses."[11] The language that is now codified at § 46a-86 (c), however, was first enacted in 1967. See Public Acts 1967, No. 756, § 1.[12] Section 46a-58, then codified at General Statutes § 53-34, was not incorporated into the statute until 1975. See Public Acts 1975, No. 75-462. Accordingly, I do not believe that the language of § 46a-58 sheds any light on the scope of the remedy provided by § 46a-86 (c).[13]

Moreover, even if it is assumed that the discrimination statutes originally included within the scope of

---

analysis, however, I accept the majority's characterization of the statute as "broad and inclusive . . . ."

[11] Applying the same reasoning, the majority presumably would *assume* from the fact that the right conferred by § 46a-58 is broad that it gives rise to an unconditional private right of action. We have concluded otherwise, however. See *Sullivan* v. *Board of Police Commissioners*, 196 Conn. 208, 215–16, 491 A.2d 1096 (1985). In *Sullivan*, we held that General Statutes §§ 46a-58 through 46a-81 "must be read in conjunction with the [statutory] provisions for the filing of complaints concerning alleged discriminatory practices with the [commission]"; id., 215; and the commission then determines the scope of the remedy. Id., 216. Likewise, § 46a-58 must be read in conjunction with § 46a-86 (c) to determine the scope of damages.

[12] Public Acts 1967, No. 756, § 1, codified in part at § 46a-86 (c), referred only to General Statutes § 53-35, now codified at General Statutes § 46a-64, which prohibits discriminatory public accommodations practices, and General Statutes § 53-35a, now codified at General Statutes § 46a-59, which prohibits discrimination in associations of professional or other licensed persons.

[13] The majority finds this statement "curious" in light of my conclusion that "§ 46a-58 must be read in conjunction with § 46a-86 (c) to determine the scope of damages." See footnote 11 of this dissenting opinion. The language now codified as § 46a-86 existed *before* it provided a remedy for a violation of the statute now codified as § 46a-58, however. Therefore, the scope of the remedy provided by § 46a-86 (c) logically may be considered without reference to § 46a-58—unless the majority believes that Public Acts 1975, No. 75-462, amended the scope of the remedy now codified as § 46a-86 (c) by implication. It would be absurd, however, to disregard the language of § 46a-86 (c) when considering the scope of the remedy for a violation of § 46a-58.

what is now § 46a-86 (c) created a broad right, the majority cites no authority in support of its assumption that the legislature's creation of a broad right that may be exercised in a variety of contexts implies a legislative intent to provide for a wide variety of damages. It seems to me at least plausible, as a general matter, that the legislature might seek to balance the creation of a broad right by providing only a limited range of damages.[14]

The majority then concludes that the fact that § 46a-86 (c) lists only certain out-of-pocket expenses can be explained by the fact that several of the specific discrimination statutes referenced therein "might lend themselves, more readily than the general discrimination prohibited by § 46a-58 (a), to assessment of damages that would be calculable in terms of monetary loss." I do not understand, however, how the fact that the specific types of damages listed in § 46a-86 (c) may be incurred under the specific statutes listed therein gives rise to an inference that the legislature intended to provide for a broader range of damages. A violation of any of the specific discrimination statutes referred to in § 46a-86 (c) could give rise to a broad range of

---

[14] In the workers' compensation context, for example, we have recognized that the legislature has balanced the broad beneficial purpose of the statute with a limitation on remedies. See *Mello* v. *Big Y Foods, Inc.*, 265 Conn. 21, 25–26, 826 A.2d 1117 (2003).

The majority criticizes my reasoning on the ground that, "[a]lthough what the legislature *'might* seek to' do could always be 'plausible,'" I present no persuasive reason to believe that the legislature intended to limit remedies. (Emphasis in original.) I strongly disagree. First, I present this conditionally phrased alternative interpretation at the outset of my analysis simply to demonstrate that the creation of a right that may be exercised in a wide variety of contexts does not *necessarily* imply the creation of a broad remedy; unlike the majority, I do not suggest that my alternative reading would be presumptively correct in the absence of any independent evidence. Second, as I discuss later in this dissenting opinion, the plain language of § 46a-86 (c) does in fact provide a compelling reason to adopt this alternative interpretation. It is the majority that has provided no persuasive reason to support its assumption that the broad language of § 46a-58 overrides the plainly restrictive language of § 46a-86 (c).

damages, including emotional distress. If the legislature had desired to provide for the recovery of such damages, it easily could have done so expressly.

The majority then turns to the legislative genealogy and history of § 46a-86 (c). It points to general statements made by Representative William J. Lavery that the statute was intended to provide a right to seek civil damages and to protect the human dignity of citizens of the state as "suggestive of a legislative intent that the commission's authority to determine the damages arising from the commissioner's finding of a discriminatory practice be broadly, rather than narrowly, construed." I do not agree that these general comments support the specific conclusion reached by the majority that the compensatory damages provided by § 46a-86 (c) include damages for emotional distress. I also do not agree, for reasons that I have stated previously in this dissenting opinion, that the genealogy of the statute, which shows that the legislature has periodically increased the number of discrimination statutes for which the remedy provided by § 46a-86 (c) is available, sheds any light on the scope of the remedy itself.

The majority next determines that "[i]t would be consistent with [the general remedial purpose of the antidiscrimination statutes] to read the language of § 46a-86 (c) to mean that the commission has the authority to award personal compensatory damages." As I have indicated, however, the fact that the legislature has created a broad statutory right does not necessarily imply that it intended to provide for a broad range of damages. This court previously has recognized that in construing a statute, our task is not to determine whether the legislature rationally *could have* enacted a statutory provision, but to determine whether the legislature actually intended to do so. See *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 119, 830 A.2d 1121 (2003). I see no independent

evidence that the legislature had the intention ascribed to it by the majority.

Finally, the majority relies on this court's decision in *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 653 A.2d 782 (1995), in support of its conclusion that § 46a-86 (c) contemplates an award of damages for emotional distress. In that case, we determined that damages for emotional distress and attorney's fees are not available under § 46a-86 (a), which provides the remedy for discriminatory employment practices that violate General Statutes § 46a-60. Id., 93, 101. We reasoned that if compensatory damages were available under § 46a-86 (a), then § 46a-86 (c) would be superfluous. Id., 101. We also determined that the legislative history of § 46a-86 (a) indicated that the term "affirmative action" as used therein contemplated a narrower remedy than the remedy of compensatory damages provided in § 46a-86 (c). Id., 102–103. The majority concludes that this shows that damages for emotional distress are compensable under § 46a-86 (c). I disagree. I would conclude that *Bridgeport Hospital* merely held that the term "affirmative action" as used in § 46a-86 (a) was not intended to include the compensatory damages contemplated by § 46a-86 (c) and that damages for emotional distress, *if compensable at all*, would be compensable in connection with the discriminatory conduct listed in that subsection.[15] If § 46a-86 (c) had expressly excluded

---

[15] The majority criticizes what it calls my "revisionist understanding" of this case on the ground that "we stated repeatedly [in *Bridgeport Hospital*] that compensatory damages and attorney's fees were precluded from § 46a-86 (a) 'because of the express restriction on the availability of such awards to cases brought under the specific statutes enumerated in subsections (c) and (d)' . . . *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, [232 Conn. 100] . . . ." I agree that we concluded in that case that compensatory damages are available only under § 46a-86 (c), not under § 46a-86 (a), and that compensatory damages are available only for specific forms of discrimination. Although we may have *assumed* in that case that such compensatory damages include damages for emotional distress, however, we did not make such a finding and such a finding was

damages for emotional distress, I do not believe that we would have concluded in *Bridgeport Hospital* that damages for emotional distress were contemplated in the term "affirmative action" as used in § 46a-86 (a). Accordingly, any suggestion in that case that § 46a-86 (c) contemplated damages for emotional distress was dicta, at best.

On the basis of the foregoing analysis, the majority concludes that § 46a-86 (c) authorizes the commission to award Ballard damages for emotional distress. The majority then turns, as an afterthought,[16] to the defendants' arguments that are based on the plain language of the statute and rejects those arguments. I would agree with the defendants that the plain language of the statute clearly precludes recovery of damages for emotional distress.

Section 46a-86 (c) provides that "the presiding officer shall determine the damage suffered by the complainant, which damage shall include, but not be limited to, the expense incurred by the complainant for obtaining alternate housing or space, storage of goods and effects, moving costs and *other costs actually incurred by him* as a result of such discriminatory practice and shall allow reasonable attorney's fees and costs." (Emphasis added.) In my view, it could not be clearer, under the

not a necessary predicate to our conclusion. Section 46a-86 (c) provides an *additional* remedy for certain specific forms of discrimination. It would be absurd to conclude that, because damages for emotional distress are not included in that remedy, they are included in the narrower remedy provided by § 46a-86 (a). Accordingly, my conclusion that § 46a-86 (c) does not provide damages for emotional distress is not inconsistent with the fundamental reasoning or the result of *Bridgeport Hospital*.

[16] The majority emphatically objects to my use of the word "afterthought" in this context. It is clear, however, that the majority considers the defendants' arguments based on the plain and ordinary meaning of the language of § 46a-86 (c) only *after* reaching its conclusion as to the meaning of the statute on the basis of the language of § 46a-58 and the legislative history and genealogy of § 46a-86 (c).

doctrine of ejusdem generis,[17] that the legislature intended to limit recoverable damages to "costs actually incurred"; General Statutes § 46a-86 (c); by a complainant.[18] The "but not . . . limited to" language of § 46a-86 (c) merely indicates that the statute's list of out-of-pocket costs is not exclusive;[19] it does not indicate that other *kinds* of damages may be recovered.

The majority rejects this obvious conclusion, however, because "it would unduly narrow the types of remedies available for a violation of § 46a-58, which . . . contemplates a wide range of misconduct." This argument is valid, however, only if it is assumed that a statute that contemplates a wide range of misconduct *necessarily* contemplates a broad range of remedies for that misconduct. As I have noted, it is the *majority*,

---

[17] The doctrine of ejusdem generis is a rule of construction that "applies when '(1) the [clause] contains an enumeration by specific words; (2) the members of the enumeration suggest a specific class; (3) the class is not exhausted by the enumeration; (4) a general reference [supplements] the enumeration . . . and (5) there is [no] clearly manifested intent that the general term be given a broader meaning than the doctrine requires.' . . . 'It rests on particular insights about everyday language usage. When people list a number of particulars and add a general reference like "and so forth" they mean to include by use of the general reference not everything else but only others of like kind.' " (Citation omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 297, 685 A.2d 305 (1996).

[18] The majority argues that this doctrine "is merely an axiom of statutory construction, not an inviolate rule of law," and, as such, " 'cannot displace the result of careful and thoughtful interpretation.' *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 460, 692 A.2d 742 (1997) . . . ." (Citation omitted.) I do not suggest that the doctrine is an inviolate rule of law. I contend only that the language of a statute is the proper place to begin our interpretation and that the doctrine of ejusdem generis provides a reliable guide to the ordinary meaning of that language. Once we have discerned the ordinary meaning, we then consider whether there are important reasons that the ordinary meaning should not be given effect. The majority reverses this process by first identifying policy reasons that support its interpretation of the statute and then determining whether the language is consistent with its interpretation.

[19] Thus, the majority's statement that my interpretation would render this language superfluous is incorrect.

not the *legislature*, that has reached that conclusion.[20] In other words, the majority assumes the answer to the question before us and then rejects the contrary answer as inconsistent with its assumption, *even though the plain language of the statute compels the contrary answer*. This is legislating, not interpreting legislation.

I would conclude that, even if the majority is correct that this case falls within the ambit of § 46a-86 (c), the plain language of the statute clearly limits recoverable damages to "costs actually incurred." I therefore see no need to address the other arguments made by the defendants in support of that interpretation.[21] I am compelled to state, however, that, in analyzing and ultimately rejecting those arguments, the majority in several instances applies the same question begging technique that I have already described.

### III

I next address the defendants' claim that the trial court improperly concluded that § 46a-58 gives the commission jurisdiction over claims arising under § 10-15c. I agree with the defendants that the commission does not have jurisdiction over such claims.

In *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 344, 680 A.2d 1261 (1996), the commission argued that "§ 46a-58 (a) encompasses claims of discriminatory employment practices [in violation of § 46a-60] and that violations of § 46a-58 (a) entitle a claimant to damages for emotional distress pursuant to § 46a-86 (c)." We disagreed. Id. Applying the "well-settled principle of [statutory] construction that specific terms covering the given subject

---

[20] This technique is familiar. See *State* v. *Courchesne*, 262 Conn. 537, 609, 816 A.2d 562 (2003) (*Zarella, J.*, dissenting).

[21] I also see no need to address the defendants' claim that Ballard has waived any right to obtain relief by failing to file an appeal or participate in the commission's appeal.

matter will prevail over general language of the same or another statute which might otherwise prove controlling"; (internal quotation marks omitted) id., 346; we concluded that "the specific, narrowly tailored cause of action embodied in § 46a-60 supersedes the general cause of action embodied in § 46a-58 (a)." Id. We also concluded that, despite the broad language of § 46a-58 (a), the existence of distinct remedies for violations of §§ 46a-60 and 46a-58 reflected "a clear intention by the legislature to restrict the scope of both subsections to only certain types of discrimination."[22] (Internal quotation marks omitted.) Id., 347. Thus, in my view, *True-love & Maclean, Inc.*, clearly stands for the proposition that, if a specific discrimination statute with specific remedies exists, and if that statute is not among those listed in § 46a-86 (c), the remedies provided by § 46a-86 (c) are not available by virtue of that statute's reference to § 46a-58. Accordingly, although I agree with the majority that the language of § 46a-58 is broad and inclusive, I would conclude that it does not apply to claims arising under more specific *discrimination* laws.[23] Indeed, that is the only plausible reading of *True-love & Maclean, Inc.*

---

[22] Thus, I do not, as the majority states, "[ignore] the express reference in § 46a-58 (a) that makes it a discriminatory practice to cause any person to be subjected to the deprivation of any rights secured by, among other things, the 'laws of this state . . . .' " I merely employ the interpretation of § 46a-58 that we adopted in *Truelove & Maclean, Inc.* We implicitly recognized in that case that the "any . . . laws of this state" language in § 46a-58 cannot be interpreted literally because doing so would interfere with the operation of more specific discrimination statutes. See *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, supra, 238 Conn. 346. It is the majority who ignores—and implicitly overrules—the teaching of *Truelove & Maclean, Inc.*, by concluding that § 46a-58 encompasses forms of discrimination that fall within the scope of distinct discrimination statutes.

[23] This conclusion is bolstered by *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 232 Conn. 91. In that case, the commission cited § 46a-86 (a) as authority to award damages for emotional distress and attorney's fees following a finding of a discriminatory employment practice. Id., 100. We concluded that compensatory damages were

The majority concludes that any reliance on *True-love & Maclean, Inc.*, is misplaced because, in that case, the jurisdiction of the commission over claims arising under § 46a-60 was not in issue. The only question was what remedies were available to the complainant. This court's holding that the remedies of § 46a-86 (c) are not available if a distinct statute provides a remedy for the specific type of discrimination claimed necessarily implies, however, that § 46a-58 does not apply if such a statute exists. In *Truelove & Maclean, Inc.*, the fact that § 46a-58 did not apply did not have jurisdictional implications because the commission still had jurisdiction over the complainant's claims under § 46a-60. In this case, however, § 46a-58 is the only claimed source of jurisdiction. Chapter 814c of the General Statutes, entitled "Human Rights and Opportunities," contains no specific provision prohibiting discrimination against a student in a public school setting.[24] Because § 46a-58 does not give the commission jurisdiction over claims arising under § 10-15c, there is *no* basis for its jurisdiction over such claims.[25]

---

available only under § 46a-86 (c). Thus, both the commission and this court assumed that the commission could not rely directly on § 46a-86 (c) for authority to award damages on a claim arising under § 46a-60.

[24] General Statutes § 46a-75 (a) provides: "All educational, counseling, and vocational guidance programs and all apprenticeship and on-the-job training programs of state agencies, or in which state agencies participate, shall be open to all qualified persons, without regard to race, color, religious creed, sex, marital status, age, national origin, ancestry, mental retardation, mental disability, learning disability or physical disability, including, but not limited to, blindness." In the present case, the presiding human rights referee granted the defendants' motion to dismiss Ballard's claim under § 46a-75 on the ground that the statute applies only to "state agencies and their educational programs related to employment-related training," and that public schools were not within the scope of the statute. That ruling is not challenged in this appeal.

[25] The majority attempts to distinguish *Truelove & Maclean, Inc.*, on the ground that the statute at issue in that case, § 46a-60, was " 'narrowly tailored,' " while § 10-15c is not. We stated in that case that, in contrast to § 46a-58, "which generally forbids 'any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the constitution or laws of this state

This conclusion is supported by the commission's own decisions. In *Atlas* v. *Hamden High School*, Commission on Human Rights & Opportunities, Opinion No. 7930381 (August 20, 1980), the complainant raised a claim before the commission that the public school that

or the United States, on account of religion, national origin, alienage, color, race, sex, blindness or physical disability, § 46a-60 specifically prohibits discriminatory *employment* practices. Accordingly, the specific, narrowly tailored cause of action embodied in § 46a-60 supersedes the general cause of action embodied in § 46a-58 (a)." (Emphasis in original; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, supra, 238 Conn. 346. Similarly, § 10-15c, which is narrowly tailored to prohibit discriminatory practices *in the public schools*, supersedes § 46a-58 (a). I simply do not see the relevance of the fact that, unlike § 46a-60, § 10-15c does not contain "two subsections containing eleven and four subdivisions, respectively." Regardless of whether § 10-15c is as *elaborately* tailored as § 46a-60, it is clearly more *narrowly* tailored than § 46a-58. Accordingly, the reasoning of *Truelove & Maclean, Inc.*, applies.

In any event, our comparison of the relative specificity of §§ 46a-60 and 46a-58 in *Truelove & Maclean, Inc.*, was only the first step of our analysis in that case. We went on to note that § 46a-86 (c) did not provide a remedy for a violation of § 46a-60 by virtue of its incorporation of § 46a-58 because a violation of § 46a-60 had its own specific remedy. Likewise, a violation of § 10-15c has a specific remedy, namely, that provided by General Statutes § 10-4b. The majority argues, however, that § 46a-86 (c) *must* apply to § 10-15c because, from 1969 through 1979, the state board lacked any "genuine . . . power" to enforce § 10-15c under § 10-4b. In other words, the majority believes that the *narrowness* of the remedy provided by the original version of § 10-4b "suggest[s] that it is unlikely that the legislature intended it to be the exclusive remedial administrative agency for a claim of racial discrimination in the public schools." As the majority acknowledges, however, under the reasoning of *Truelove & Maclean, Inc.*, the fact that the remedy provided by the original version of § 10-4b was " 'narrowly tailored' " suggests that the broader remedy of § 46a-86 (c), made applicable to § 46a-58 by the legislature in 1975, does *not* apply.

Finally, I note that § 10-15c applies to discrimination on the basis of sexual orientation, which § 46a-58 does not, and that § 46a-58 applies to discrimination on the basis of alienage, blindness or physical disability, which § 10-15c does not. Under the majority's view, a student presumably would be able to bring a claim under § 46a-86 (c) for discrimination in the public schools on the basis of alienage, but would not be able to bring a claim for discrimination on the basis of sexual orientation. I find it unlikely that the legislature intended either: (1) to prohibit types of discrimination in the public schools that are not listed in § 10-15c; or (2) to provide different remedies for the different types of discrimination that are listed in that statute. I assume that the legislature had good reasons for including discrimination on the basis of alienage, blindness and physical disability in § 46a-58 but not in § 10-15c.

she attended had discriminated against her on the basis of her age in violation of a statute prohibiting discrimination in places of public accommodation. The respondents argued that claims of discrimination in the public schools must be brought under § 10-15c. The commission hearing examiner agreed. He also stated that "[n]othing suggests that the legislature intended to vest any enforcement authority for § 10-15c in the commission on human rights and opportunities or to incorporate or to utilize the mechanism of chapter 563 [now chapter 814c] in such enforcement. The commission having no jurisdiction in or responsibilities over discrimination in access to public school activities and programs, the complaint must therefore be and hereby is, dismissed."

In *Alston* v. *Board of Education,* Commission on Human Rights & Opportunities, Opinion No. 9830205 (May 3, 2000), the complainant again raised before the commission a claim under § 10-15c. The presiding human rights referee concluded that granting the commission "unlimited authority to pursue any statute enumerated in the . . . General Statutes under the auspices of § 46a-58 (a) . . . would eviscerate the definition of a 'discriminatory practice' in [General Statutes] § 46a-51 (8)."[26] The referee, citing the commission's ruling on the defendants' motion to dismiss in the present case, also noted that the legislature had consolidated a number of discrimination laws under title 46a of the General Statutes in 1980, but had not included § 10-15c in the consolidation.[27] She concluded that this evinced a legislative intent that claims pertaining to discrimination in the public schools would be handled by the

[26] General Statutes § 46a-51 (8) provides: " 'Discriminatory practice' means a violation of section 4a-60, 4a-60a, 46a-58, 46a-59, 46a-60, 46a-64, 46a-64c, 46a-66, 46a-68, sections 46a-70 to 46a-78, inclusive, subsection (a) of section 46a-80, or sections 46a-81b to 46a-81o, inclusive . . . ."

[27] I discuss this 1980 legislation in greater depth later in this dissenting opinion.

department of education.[28] Accordingly, the referee determined that the commission did not have jurisdiction over claims arising under § 10-15c.

It is well settled that we may make an "inference of legislative concurrence with the agency's interpretation . . . from legislative silence concerning that interpretation . . . ." (Internal quotation marks omitted.) *Gil* v. *Courthouse One*, 239 Conn. 676, 705, 687 A.2d 146 (1997) (*Berdon, J.*, concurring and dissenting). Where an agency's long-standing interpretation of a statute is reasonable, it should control. *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 594, 698 A.2d 873 (1997). Accordingly, I believe that the commission's decisions provide powerful support for the defendants' position. The majority, however, concludes that the principle of legislative acquiescence does not apply. It reasons in part that, although the legislature has been silent since the commission's *Atlas* decision in 1980, it also has been silent since the trial court's decision in the present case more than two years ago and, therefore, its silence is ambiguous. The pendency of this appeal is one plausible explanation for the legislature's silence following the trial court's decision in the present case. There is no such explanation for the more than twenty years of silence that followed the *Atlas* decision.

Moreover, I am persuaded by the commission's reasoning in these cases. As the commission suggested in *Alston*, if there was any question as to whether the legislature had intended to make the remedy provided

---

[28] The referee also noted that both the Superior Court and the United States District Court have held that § 10-15c "is to be enforced specifically by the state board of education pursuant to § 10-4b." *McPhail* v. *Milford*, Superior Court, judicial district of Ansonia-Milford, Docket No. 054506S (February 25, 1999), citing *Price* v. *Wilton Public School District*, United States District Court, Docket No. 97 CV 02218 (D. Conn., September 23, 1998). In those cases, however, the court considered whether § 10-15c, as enforced through § 10-4b provided a private cause of action, not whether the commission had jurisdiction over claims arising under that statute.

by § 46a-86 (c) available for all forms of discrimination in any and all contexts, including racial discrimination in the public schools, when it enacted Public Acts 1975, No. 75-462, and added the reference to § 53-34, now codified as § 46a-58, to the last sentence of General Statutes § 53-36, now codified as § 46a-86 (c); see footnote 27 of the majority opinion; any such question was answered in the negative in 1980. In that year, the legislature consolidated several discrimination statutes into title 46a. See Public Acts 1980, No. 80-422.[29] The remedy provided by § 46a-86 (c) continued, however, to be available only for violations of § 46a-58 (formerly § 53-34), General Statutes § 46a-59 (formerly General Statutes § 53-35a), and General Statutes § 46a-64 (formerly General Statutes § 53-35). As we recognized in *Truelove & Maclean, Inc.*, the reading given by the majority to § 46a-58, that the statute includes discrimination prohibited by distinct discrimination statutes, simply cannot be reconciled with the legislature's choice to continue to restrict the application of § 46a-86 (c) to certain specific statutorily prohibited discriminatory practices. In other words, if the legislature had understood § 46a-58 to include discrimination prohibited by other state statutes in 1975, then there would have been

[29] Following the enactment of Public Acts 1980, No. 80-422, § 53-34 was transferred to § 46a-58; § 53-35, prohibiting discriminatory public accommodations practices, was transferred to § 46a-64; § 53-35a, prohibiting discrimination in associations of professional or other licensed persons, was transferred to § 46a-59; General Statutes § 31-126, prohibiting discriminatory employment practices, was transferred to § 46a-60; General Statutes § 36-437, prohibiting discriminatory credit practices, was transferred to General Statutes § 46a-66; General Statutes § 4-61d, prohibiting discriminatory practices by state agencies, was transferred to General Statutes § 46a-71; General Statutes § 4-61e, prohibiting discrimination in job placement by state agencies, was transferred to General Statutes § 46a-72; General Statutes § 4-61f, prohibiting discrimination in state licensing and charter procedures, was transferred to General Statutes § 46a-73; General Statutes § 4-61h, prohibiting discrimination in educational and vocational programs, was transferred to § 46a-75; and General Statutes § 4-61i, prohibiting discrimination in allocation of state benefits, was transferred to General Statutes § 46a-76.

no need for it expressly to include §§ 46a-59 and 46a-64 in § 46a-86 (c) in 1980.[30] Conversely, if *Truelove & Maclean, Inc.*, was correctly decided and the legislature's choice to list certain specific statutes in § 46a-86 (c) implied a legislative desire to exclude other statutes within the commission's jurisdiction from the scope of § 46a-58, then, a fortiori, that choice evinced an intent to exclude statutes outside of title 46a.[31] Section 10-15c is not listed in § 46a-86 (c) and was not among the discrimination statutes incorporated into title 46a in 1980. In my view, this establishes conclusively that the legislature never intended for the commission to have jurisdiction over claims arising under § 10-15c.[32] More-

[30] I note that Public Acts 1980, No. 80-422, § 8, codified at General Statutes (Rev. to 1981) § 46a-59, prohibits discrimination in associations of licensed persons on the basis of "race, national origin, creed, sex or color." All of these types of discrimination were also listed in Public Act 80-422, § 7, codified at General Statutes (Rev. to 1981) § 46a-58. See General Statutes (Rev. to 1981) § 46a-58 (prohibiting discrimination on basis of "religion, national origin, alienage, color, race, sex, blindness or physical disability"). Thus, it cannot be argued that the legislature's inclusion of specific discrimination statutes in § 46a-86 (c) was intended to provide a remedy for specific classes of persons who otherwise would not have the remedy. Rather, the legislature's focus was on providing that remedy for discriminatory practices occurring in specific contexts. Conversely, the *exclusion* from § 46a-86 (c) of certain distinct discrimination statutes evinces an intent *not* to provide the remedy for discriminatory practices arising in certain contexts. This view is consistent with our analysis in *Truelove & Maclean, Inc.*, in which we focused on the existence of a specific statute prohibiting discriminatory employment practices—not on the exclusion from § 46a-58 of the class of pregnant women—in concluding that § 46a-86 (c) did not provide a remedy for a violation of § 46a-60.

[31] The trial court concluded that *Truelove & Maclean, Inc.*, did not govern this case because, unlike the statute at issue in that case, namely, § 46a-60, claims arising under § 10-15c would not be within the commission's jurisdiction in the absence of § 46a-58 and, therefore, the commission was not faced with conflicting remedial statutes under its jurisdiction. In my view, however, the reasoning of *Truelove & Maclean, Inc.*, applies all the more *strongly* because § 10-15c falls within a completely separate title of the statutes.

[32] The majority argues that "no legitimate inference of legislative intent—either to include or exclude § 10-15c—can be drawn from the 1980 legislation, and that all of the specific statutory references transferred from § 53-36 into § 46a-86 (c), by virtue of the technical revision, were transferred simply so that the statutes governing the commission could be located

over, as the majority notes, the legislature has amended § 46a-86 (c) several times since 1980; see Public Acts 1990, No. 90-246, § 11; Public Acts 1991, No. 91-58, § 30; and, despite the commission's decision in *Atlas* v. *Hamden High School*, supra, No. 7930381, has not seen fit to list § 10-15c in the statute. "Legislative concurrence is particularly strong where the legislature makes unrelated amendments in the same statute." (Internal quotation marks omitted.) *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 594.

I am also persuaded by the defendants' argument that vesting concurrent jurisdiction over claims of racial discrimination arising in the public schools in the state board of education and in the commission will render General Statutes §§ 10-15c and 10-4b superfluous. The majority rejects this argument because "the availability of remedies may differ depending on whether the commission or the state board pursues the claim. Whereas the tenor of § 10-4b (b) is concerned with corrective or prospective measures, namely, 'requir[ing] the local or regional board of education to engage in a remedial process . . . [and] implement[ing] a plan of action through which compliance may be attained,' § 46a-86

---

together." Thus, the majority believes that the legislature's choice *not* to list certain specific discrimination statutes—such as those prohibiting discriminatory practices by state agencies; see General Statutes §§ 46a-69 through 46a-76 and §§ 46a-81g through 46a-81n; in § 46a-86 (c) provides *no* guidance to this court as to whether the remedy provided by that statute is available through § 46a-58 when the specific discrimination statute has been violated. I can only reiterate that this analysis renders completely meaningless the legislature's choice to include certain discrimination statutes in § 46a-86 (c) and to exclude others.

The majority also argues that, if § 46a-86 (c) applies only to the discrimination statutes that are listed therein, the reference to § 46a-58 would be superfluous. I do not suggest that § 46a-86 (c) does not apply to § 46a-58, however. I contend that § 46a-58 does not apply to forms of discrimination that are prohibited by distinct statutes. Section 46a-58 would be superfluous only if there is a distinct discrimination statute for every conceivable form of discrimination covered by that statute.

(c) is more concerned with compensatory measures to remedy past discrimination, namely, 'the damage suffered by the complainant . . . .' " The majority fails to recognize, however, that § 46a-86 (a) authorizes the commission to "issue . . . an order requiring the respondent to cease and desist from the discriminatory practice and further requiring the respondent to take such affirmative action as in the judgment of the presiding officer will effectuate the purpose of this chapter." Thus, the commission has the authority *both* to take corrective or prospective measures *and* to award compensatory damages. Under these circumstances, I cannot perceive why any person would choose to proceed under § 10-4b rather than § 46a-86 (c). This effective removal of claims of racial discrimination in the public schools from the jurisdiction of the state board of education means that the agency with special expertise over issues involving the public schools will have no voice in the remediation of such discrimination.

Finally, I believe that our state and national history of litigation involving claims of racial discrimination in the public schools compels the conclusion that legislature did not intend to give jurisdiction over such claims to the commission. Such claims frequently involve highly complex, sensitive and controversial societal and political questions involving multiple parties, including government bodies at all levels of state government and large numbers of students. Our national history demonstrates that remedying such discrimination can require years, even decades, of political struggle and compromise. See, e.g., *Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). A review of this state's history of litigation involving state constitutional claims of racial discrimination in the public schools reveals a similar pattern. In *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A.2d 1267 (1996), this court concluded that the racial and ethnic isolation of Hartford's public

school students was caused by state action and was unconstitutional under the state constitution. Id., 39–40, 43. We also concluded that "[p]rudence and sensitivity to the constitutional authority of coordinate branches of government" counseled against ordering a specific remedy. Id., 46. *Sheff* was originally filed in 1989; this court's decision was issued in 1996; and, as of the date of this opinion, the conditions that this court found to be unconstitutional still have not been fully remedied. See Office of Legislative Research Report No. 2003-R-0112 (January 27, 2003), www.cga.state.ct.us/2003/olrdata/ed/rpt/2003-R-0112.htm (explaining January 22, 2003 settlement agreement in *Sheff* case and noting that agreement allows plaintiffs to seek further enforcement of this court's *Sheff* decision after June 30, 2007). Under the majority's "broad and inclusive" reading of §§ 46a-58 and 46a-86 (c) in the present case, each student in the Hartford public schools would have a claim for damages against the state for the emotional distress caused by his or her racial isolation and perhaps for the costs of obtaining an alternate education up to the time that the discriminatory conditions are remedied, potentially exposing the state and its political subdivisions to damage awards in the millions of dollars.[33] It

---

[33] The majority is "highly dubious" that its opinion in this case would lead to such a result and disclaims any suggestion that the commission would have jurisdiction over "claims of *systemic* racial isolation in the public schools . . . ." (Emphasis added.) I cannot perceive any basis for the majority's doubt. If, as the majority has concluded, violations of § 10-15c—which does not distinguish between "a discrete course of . . . discriminatory conduct by an identified school official" and "systemic" discrimination—fall within § 46a-58, I simply do not understand what authority this court could invoke to avoid enforcing the remedy provided by § 46a-86 (c). In *Sheff*, we left the fashioning of the remedy for the state *constitutional* violation to the legislature and the executive branch in deference to the constitutional authority of those branches. The legislature, in the exercise of its constitutional authority, already has fashioned a specific statutory remedy for the violation of § 46a-58, however. Does the majority believe that the enforcement of that remedy in a case involving systemic discrimination would violate the state or federal constitution? If not, then what principle would justify its refusal to enforce the remedy?

is inconceivable to me that the legislature intended to provide such a remedy.

I would conclude that the commission does not have jurisdiction over claims arising under § 10-15c.

Accordingly, I dissent.

Moreover, the distinction that the majority attempts to draw between "a discrete course of . . . discriminatory conduct by an identified school official" and "systemic" discrimination is illusory. Discrimination claims, by their very nature, involve classes of persons. If a single teacher discriminates against 400 members of a protected class over the course of ten years, is that a compensable "discrete course of . . . discriminatory conduct" or is it noncompensable "systemic" discrimination? What is the result if an entire school district discriminates over the course of ten years against a single member of a protected class who is within its jurisdiction? Will the success of a claim for damages brought under § 10-15c, through § 46a-58, depend on the number of persons who can bring a similar claim? The majority may believe that the commission and our courts will be able to provide principled answers to these questions. I have serious doubts. More importantly, I do not believe that the legislature intended to give them the authority to do so.

Finally, the majority relies on the "total absence of any legislative, executive or judicial indication that the commission would have any role, pursuant to §§ 46a-58 or 46-86 (c), or otherwise, in that remedial scheme" in support of its position. Once again, the majority assumes what it should prove—that the silence of the legislature, the executive branch and the judiciary shows that they believed that the commission had no jurisdiction over claims of *systemic* discrimination. That silence may just as easily be interpreted as establishing that the legislature, the executive branch and the judiciary believed that the commission had no jurisdiction over *any* claims of racial discrimination arising in the public schools, systemic or otherwise.